THE FOUNDATION COMPANY, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 10448.    Promulgated June 30, 1950.

*Joseph C. White, Esq.*, and *Marcel W. Singer, Esq.*, for the petitioner.

*William A. Schmitt, Esq.*, for the respondent.

HARRON, *Judge*: Respondent determined a deficiency in petitioner's income tax for the calendar year 1942 in the amount of $151,506.73. This deficiency results principally from respondent's disallowance of alleged net operating loss carry-overs from 1940 and 1941 and an alleged net operating loss carry-back from 1943. Petitioner contests this disallowance, but does not contest certain other adjustments to its net income for 1942 made in the notice of deficiency. Petitioner claims that it has made overpayment of tax and is entitled to a refund.

The parties have stipulated that the petitioner sustained a loss of

$56,323.42 for the year 1944, and that said amount represents a net operating loss carry-back for the year 1942 to the extent of any taxable income for 1942.

The principal issues for decision in this proceeding are as follows:

(1) Whether petitioner is entitled to deduct in 1940 the unamortized balance of an expense which was prepaid in 1929. If a deduction is allowable, the amount of the deduction to which petitioner is entitled must be determined.

(2) Whether petitioner sustained deductible loss in 1940 or 1941 upon the conversion of Peruvian "soles" which it received in 1940 and 1941. If loss was sustained, there is a further question whether the loss resulted from the sale or exchange of capital assets within the contemplation of section 122 (d) (4).

(3) Whether petitioner is entitled to a deduction for a loss in 1943 upon the abandonment of a lawsuit against the Chilean Government in 1943.

Petitioner filed its return for 1942 with the collector of internal revenue for the second district of New York.

## Issue 1.

### FINDINGS OF FACT.

Some of the facts under this issue have been stipulated. The facts which have been stipulated are found as facts. The stipulation is incorporated herein by this reference. The facts which are necessary for an understanding of the question presented are as follows:

The petitioner, hereinafter called Foundation, is a New York corporation, having its principal place of business in New York City. It is engaged in the construction and general engineering business, and it specializes in foundation work. It does engineering and construction work both in the United States and in foreign countries. It keeps its books and makes its tax returns on the accrual basis.

(a) On September 7, 1925, Foundation entered into a construction contract with the Government of Greece to perform reclamation and irrigation projects in Greece. The contract was entitled "Contract for the Execution of Works in the 'Salonika Plain.'"

In November, 1925, Foundation caused another corporation to be organized, which was known as "The Foundation Company (Foreign)," which is hereinafter referred to as Foreign, for the purpose of performing the above contract. Foundation assigned the contract to Foreign on December 31, 1925. Foreign assumed all of the rights and obligations of Foundation under the contract, and carried out the provisions of the contract until March 8, 1932, at which time, in the liquidation of Foreign, the contract was reassigned to Foundation. Thereafter, Foundation carried on work under the contract until 1937,

when a project which was known as the Vardar Valley project was completed.

The contract with the Greek Government provided for several reclamation projects in the area near Salonika, Greece, known as the Salonika Plain, which were described under three schedules, schedules A, B, and C, in the contract.

The contract also provided that irrigation work could be undertaken, in addition to the reclamation projects, if the Greek Government should decide to have special irrigation works constructed. The Government reserved the right to make its decision about the irrigation projects within five years from the expiration of the contractual time for the completion of the works described in schedules A, B, and C. Paragraph 4 of article 1 of the contract, which gave the Government the option to order construction of special irrigation projects, stated, in substance, that such irrigation projects did not fall strictly within the scope of the works referred to in the contract, but if election was made to proceed with them, they would be executed on the same terms and conditions as the works provided for under the contract, namely, the projects covered by schedules A, B, and C.

The contract provided also that, if the Government elected to proceed with the special irrigation projects, it was bound to entrust the work to Foundation, and Foundation was bound to undertake them under the same financial and technical conditions as it agreed to construct the reclamation projects under schedules A, B, and C.

Should the five-year period expire without any election by the Government to proceed with the special irrigation works, the parties became released from their mutual obligations.

The Greek Government did not elect to have the special irrigation projects constructed.

Foundation constructed the projects described in schedules A, B, and C. Foundation completed the work called for under either A, B, or C, and in any event the last work it was required to do under schedules A, B, and C, in 1937.

The contract made provisions, in article 8, for cancellation of the contract in the event of war in which either the United States or the Hellenic Republic should become engaged with other Powers, or in the event of civil war or civil disturbances. And, provision was made also for cancellation of the contract by mutual consent. Article 8 provided, *inter alia*, as follows:

2. If, however, this forced suspension [because of war or civil disturbances] should last longer than six (6) months, the Contractor [Foundation] has the right to give notice of cancellation of the Contract, and to consider himself free of the obligation to continue the execution of the works. * * *

Payment for the work performed was to be made on a cost-plus-fee basis. The Government agreed to pay Foundation for its services a fee equal to 15 per cent of the costs of the works and general expenses, and the fee was payable on the basis of monthly certificates. Payments of the fee were to be made in American dollars.

The Greek Government financed the construction works through a public works loan under an issue of bonds. The Greek Government pledged specified funds to secure bondholders. In order to commence surveys and preparation of plans, Foundation obligated itself to advance and deposit with the National Bank of Greece to the credit of the Greek Government, as soon as the contract came into force, the amount of $600,000, American dollars; and the Government agreed to repay Foundation the amount of the advance upon the issuance of the loan, out of the first proceeds of the loan, plus 8 per cent interest.

The financial group with which the Greek Government desired to negotiate the public works loan was headed by Sir Eric Hambro, a London banker, and president of the Hambros Bank, Ltd., which had a branch in Greece. Sir Eric Hambro had provided financial assistance to the new Greek Government at the time of the Greek Revolution. Foundation, through its president, Franklin Remington, participated in negotiations with Sir Eric Hambro in 1925, looking toward Hambro's agreement to underwrite the Greek loan. These negotiations for financing were incident to the completion of the contract with the Greek Government. Hambro desired, at first, that a British construction company should receive the construction contract, but the Greek Government preferred to have Foundation do the work. For some time it was doubtful whether Hambro would agree to underwrite the Greek loan if Foundation received the contract. It developed that Hambro desired some consideration from Foundation if it were to receive the contract, in the nature of a share of Foundation's fee from the Greek Government. Finally, Foundation, in order to get the contract, agreed to give Hambros Bank, Ltd., 5 per cent of its fee of 15 per cent. Hambros Bank agreed to underwrite the loan. The agreement of Foundation to pay Hambros 5 per cent of its fees was a condition upon which Hambros underwrote the loan. The payment of 5 per cent of fees to Hambros was a cost of Foundation in obtaining the Greek Government contract.

Foundation agreed to pay Hambros 5 per cent of its fees as it received them as work progressed under the Greek contract.

When the negotiations with Hambro were in progress, it was estimated that the costs of the projects under schedules A, B, and C of the contract would amount to the total sum of about 23 million dollars ($23,000,000), and that the 15 per cent fee of Foundation would amount to about $3,000,000. If Foundation had received fees in the total sum

of $3,000,000, it would have had to pay Hambros Bank $150,000 out of its fees under its agreement with Sir Eric Hambro.

In the end, Foundation (and Foreign) had to absorb expenses which otherwise would have been part of the costs of the work, and its fee or profit was considerably less than was estimated in 1925. Also, the cost to the Greek Government of all of the work which was completed in 1937 was substantially less than $23,000,000 because the costs were less than were estimated in 1925.

When the contract was assigned to Foreign, it became obligated to pay 5 per cent of fees or profits as received and as work progressed to Hambros Bank.

Late in 1928 Hambros Bank called upon Foreign, the assignee of both of the agreements with the Greek Government, and Hambro, to advance $48,500 to the bank under the agreement to pay it 5 per cent of fees. It was agreed that Foreign would pay the bank $48,500 in January, 1929, as a prepayment of its obligation to pay the bank 5 per cent of its fees as they were received; that Foreign would set up the prepayment on its books as an advance payment and would credit the account with amounts equal to 5 per cent of the fees it received from the Greek Government in the future from time to time until the credits totaled $48,500, and thereafter, Foreign would resume paying the bank 5 per cent of its fee receipts from the Greek Government. In 1929, as was the case in 1925, Foreign and Hambros Bank expected that the total of Foreign's fees under the construction contract would eventually aggregate about $3,000,000, from which the aggregate payments to the Bank would amount to about $150,000.

As has been stated previously, the agreement of Foundation in 1925 was made to induce Hambros Bank to underwrite the loan to Greece, to recede from its original desire to have a British firm receive the construction contract, and to agree that Foundation should have the construction contract. Hambros, in effect, desired receipt of a consideration from Foundation if it received the contract; or, in blunt terms, Hambros exacted the agreement to receive a consideration for "going along" as a condition to entering into the arrangements planned by the Greek Government. At the end of 1928, when the Bank called upon Foreign to make a lump sum advance, or prepayment, of $48,500, it was understood that said payment was a minimum payment under the 1925 agreement, and in no event was the bank to repay any part thereof to Foreign. That is to say, if the total of the 5 per cent payments which accrued during the life of the construction contract should amount to less than $48,500, nevertheless, the bank was not obligated to refund the difference.

When in 1937 construction work was completed, the credits to the bank in the prepaid expense account were less than $48,500, Founda-

tion had no right to recover the difference from the bank. There was no indebtedness owing by the bank in 1937 for the balance.

Upon making the agreement to pay the bank an advance of $48,500, Foreign's president directed its accountant to open a prepaid expense account on the books, and to enter $48,500 as a debit, and to credit the account with amounts equal to 5 per cent of its fees under the construction contract as Foreign's fees accrued under that contract. Such account was set up, and credits were made in the account from time to time as Foreign's fees were accrued. In this way the advance of $48,500 was amortized during the life of the construction contract.

Foreign did not take any deduction in any tax return in the amount of $48,500, but it deducted in 1929 and thereafter an amount which represented the amortization of the prepaid expense, the amount of the deduction being the total of the annual credits to the prepaid account. When the construction contract was reassigned to Foundation in 1932, it did the same.

From 1929 through 1937, the 5 per cent credits to the prepaid account aggregated $19,065.86, only.

Foreign was liquidated in 1932. Pursuant to the plan of liquidation, Foundation, which owned the class B stock, reacquired the Greek construction contract. Foundation continued the work under the contract until completion in 1937.

The issue of public works bonds under which the Greek Government borrowed funds for the reclamation work in the Salonika Plain, which Hambros Bank underwrote, provided the funds for the construction work under schedules A, B, and C of the contract. If the Government had elected, under the contract, to proceed with the irrigation projects under the general plan and under its right of election in the contract, it would have had to obtain funds for that work by loans or other means. The period for making such election under the contract ran for five years from the latter part of 1937, according to the pertinent clause in the construction contract. The Greek Government did not make any election to have the irrigation work done.

On October 27, 1940, Greece was attacked by Italy; and on April 7, 1941, German armies invaded Greece; and on April 26, 1941, German armies occupied Athens. Thereafter, the Greek Government went into exile, and so remained up to and including the year 1945.

Foundation did not close the prepaid expense account of $48,500 until the end of 1940. It then wrote off the balance of $29,434.14 as a loss.

Foundation's return for 1940 disclosed a net operating loss which included the above amount. In recomputing the amount of the net loss carry-over to 1942, which is the taxable year in this proceeding, the respondent decreased the amount of the net operating loss carry-

over by $29,434.14 under his determination that Foundation's net operating loss for 1940 should not include the unamortized balance of the prepaid account which is in question. Respondent gave the following explanation for his determination: "It is held that the said amount does not constitute an allowable deduction from gross income of the year 1940 or any year subsequent thereto."

(b) When Foundation reacquired the construction contract in 1932, the prepaid account of $48,500 showed total credits of $34,462.58, leaving an unamortized balance of $14,037.42. In 1934 Foundation discovered that errors had been made in the amounts of the credits entered in the account to the extent of $16,498.85. Petitioner (Foundation) made entries in its books to correct the error, decreasing the credits in the prepaid account by $16,498.85 and increasing its earned surplus account by the same amount. In its return for 1934 petitioner included $16,498.85 in gross income. However, the return for 1934 did not report any taxable income since deductions exceeded income.

### OPINION.

The chief question to be decided under this issue is whether the petitioner is entitled to a deduction in 1940 upon the writing off in that year of the unamortized balance of the account in which the prepayment of $48,500 to Hambros Bank had been amortized over the life of the contract with the Greek Government. Petitioner now claims the deduction under section 23 (a), Internal Revenue Code, as an expense in connection with the Greek Government's contract. Also, it is pointed out that, although this proceeding presents questions relating to petitioner's tax liability for 1942, petitioner is entitled to a net loss carry-over from 1940 and the amount thereof is in issue in this proceeding. If the deduction in question was not allowable in 1940, the respondent has properly reduced the amount of the 1940 net operating loss which may be carried over to 1942.

The evidence establishes that Foreign paid $48,500 to the Hambros Bank in January, 1929, and that the sum paid was a lump sum, prepayment of periodic payments which it was agreed, in 1925, would be paid from time to time during the life of the contract with the Greek Government out of fees paid by the Greek Government as work progressed at the rate of 5 per cent of the amount of the fees periodically to be received. The evidence shows, also, that the petitioner and Foreign treated the item in the accounts of the respective concerns as a prepaid item and amortized the lump-sum payment over the life of the contract by making periodic credits to the account which carried the payment as a debit. The periodic credits which were made after January, 1929, were in amounts computed on the basis of 5 per cent of the periodic fees received from the Greek Government.

It is unnecessary to decide whether the accounting treatment of the item of $48,500 was correct in 1929 and during the years following, for tax purposes, or, whether Foreign should have taken deduction in 1929 for the entire amount of $48,500, in view of the conclusion we have reached upon the question whether petitioner is entitled to any deduction in 1940. We assume, *arguendo*, and without deciding the foregoing questions, that petitioner's treatment of the item was correct up to the year 1937. Upon this hypothesis, the question to be decided is reduced to whether a deduction for the unamortized balance of the account which was set up on the books for the lump-sum payment and the amortization thereof over the life of the contract was deductible in 1940, or should have been deducted in some year prior to 1940. We have come to the conclusion that the deduction is not allowable in 1940 for the following reasons:

The contract with the Greek Government, which is in evidence, covered specifically only the construction of projects which were described in schedules A, B, and C, which were, in general, reclamation projects. The Greek Government had obtained a loan for financing the cost of the reclamation projects, but not for the cost of any other projects. Petitioner completed in 1937 all of the work it was required to do under the contract, and all of the payments for its work, consisting of fees computed on the basis of 15 per cent of cost, were either received or accrued in 1937. Likewise, in 1937 all of the "accruals" of 5 per cent of those fees which could be credited against the advance of $48,500, had been credited. At the end of 1937 the terms of the original contract had been complied with, and the work had been completed for which the loan to the Greek Government had been underwritten in 1925 by the Hambros Bank.

Petitioner contends that *if* the Greek Government had decided within five years after 1937 to have new public works projects undertaken, i. e., the irrigation works, it would have continued to credit the Hambros account with 5 per cent of the fees it received for doing the new work, under its agreements of 1925 and 1929 with Hambros Bank; and that, because of this contingency, it would not have been correct to close the account in 1937, even though the reclamation work was completed in that year; and that, consequently, it would have been improper to deduct in 1937 the amount of the unamortized balance of the prepaid account. The petitioner contends, further, that the contingencies above mentioned existed for three years until the attack upon Greece by Italy in October, 1940; that the outbreak of war in Greece ended the possibility that the Greek Government would elect to have the irrigation projects constructed, and, therefore, the year 1940 was the first year during which petitioner could determine that the unamortized balance in the account would not be reduced by

further credits, and the balance became a deductible expense in 1940.

Respondent contends that the petitioner's reasoning and argument are not sound, and that, *if* the petitioner is entitled to a deduction, the proper year for taking it was earlier than 1940. Respondent requests that judicial notice be taken of the historic fact that Great Britain declared war on Germany on September 3, 1939. He argues that the Greek Government could not have obtained a loan in Great Britain after the above date for financing further public works. He points out that the loan for the reclamation work had been underwritten in 1925 by a London bank, Hambros, and he argues that reasonable expectations could not have been maintained by petitioner of any continuation of the original contract by the Greek Government after the end of 1939.

We agree with the respondent's contentions, and hold that his determination in disallowing the claimed deduction in 1940 was correct. The evidence, in our opinion, supports the conclusion that there could not have been a reasonable expectation after the end of 1939 that the Greek Government would, or could, decide to construct the irrigation projects and, thereby, continue the original contract which had been completed in 1937, excepting for the possible continuation thereof to cover new works. There is a strong indication in the evidence that upon the completion of the reclamation work in 1937 the Greek Government did not have funds which it could set aside for new and additional work in the Salonika Plain on the proposed irrigation projects. No plans for the irrigation projects had been drafted or approved during 1937. There is no evidence that during the subsequent two years and prior to 1940, the Greek Government gave any consideration to going ahead with plans for irrigation work, or to the raising of funds to defray the costs of such construction; or that it attempted any negotiations relating to either plans for the new work or financing, or both. We take notice that war was declared by France, as well as by Great Britain, on September 3, 1939; and that Italy invaded Albania in April, 1939. Absent evidence that the Government of Greece had taken any steps up to the end of 1939 to obtain funds for carrying on further public works in the area in question, it does not appear that petitioner could have had any reasonable ground for continuing to believe, after the close of 1939, that the contingency of a decision by the Greek Government to have further work done would occur. Applying practical tests to the facts, we are unable to find that there was, after 1939, a reasonable prospect for continuation of the original contract with Greece. *Lucas* v. *American Code Co.*, 280 U. S. 445; *Boehm* v. *Commissioner*, 326 U. S. 287. Therefore petitioner erred in deducting the balance of the prepaid account in 1940.

There is a further question under this issue which it would be necessary to decide if it were held that the year 1940 is the proper year for the claimed deduction. The question relates to the basis of the account in question to the petitioner upon the acquisition of the account from Foreign when it was liquidated in 1932. In view of the holding under the chief question, it is unnecessary to consider the further question.

*Issue 2.*

### FINDINGS OF FACT.

Prior to 1928 petitioner in the regular course of its business engaged in construction work for Sociedad Anonima Limitada Propietaria del Country Club, a Peruvian corporation, hereinafter referred to as Sociedad. This work was performed on a large area of land owned by Sociedad, adjacent to Lima, Peru, and included building a clubhouse and other facilities for a country club, and constructing streets, sewers, and other utilities for the improvement of the surrounding real estate for home sites.

From time to time Sociedad made payments to petitioner for this construction work as such work progressed. However, as of January 1, 1928, Sociedad had fallen in arrears in its payments and had become indebted to petitioner in the amount of 1,836,000 Peruvian soles. This indebtedness was incurred at a time or times when the rate of exchange was 2.50 soles to the United States dollar. The total indebtedness at the then existing rate of exchange thus represented $734,400 in United States currency.

Petitioner accrued the aggregate sum of $734,400 (1,836,000 soles) on its books and reported this amount in its Federal income tax returns, as gross receipts in the years prior to 1928. Of this amount, $62,087.18 (155,217.95 soles) represented profits to which petitioner was entitled under the construction contract, and $672,312.82 (1,680,-782.05 soles) represented expenditures for which petitioner was entitled to be reimbursed under the contract.

Sociedad was unable to make an immediate payment in 1928 of the total amount of 1,836,000 soles then owed to petitioner. As a result, an agreement was entered into by Sociedad and petitioner wherein Sociedad promised to pay this debt, with interest, within a five-year period beginning January 1, 1928; however, the agreement was subject to the proviso that, if the interest payments were made when due and at least 50 per cent of the principal was amortized, petitioner would be required to extend the time for payment of the balance of the principal for an additional five-year term. To secure the performance of its obligation, Sociedad executed a mortgage in petitioner's favor on June 19, 1928. Subsequently, although Sociedad

had failed to meet its interest payments when due or to amortize any portion of the principal of the debt, petitioner on September 14, 1933, agreed to an extension of the mortgage for a further period ending January 1, 1936. Both the original mortgage and the extension thereof were constituted public instruments and duly recorded in accordance with the laws of Peru.

Prior to 1928 and thereafter, petitioner continuously and diligently attempted to collect the debt of 1,836,000 soles owed by Sociedad, without resort to foreclosure proceedings. Commencing in 1937 and extending through 1941, petitioner succeeded in collecting various payments on account of the debt in an aggregate amount of 1,641,605.24 soles. These payments were made by Sociedad in soles, which petitioner immediately converted into United States currency at rates of exchange prevailing on the respective dates of payment. The latter rates, however, were, in each instance, less favorable to petitioner than the rate of exchange prevailing when Sociedad's original indebtedness accrued to petitioner prior to 1928, i. e., 2.50 soles to the dollar.

The following schedule shows the soles collected by petitioner during the years 1937 to 1941, inclusive; the dollars actually realized thereon at the then current rates of exchange; the dollars which would have been realized thereon at the time when the debt originally accrued to petitioner; and the resultant differences due to the exchange rate variations:

| Year | Soles collected | Dollars realized at current rates of exchange | Dollars which would have been realized when debt accrued | Resultant difference |
|------|------|------|------|------|
| 1937 | 109,424.77 | $26,509.61 | $43,769.91 | ($17,260.30) |
| 1938 | 155,336.69 | 33,925.46 | 62,134.68 | (28,209.22) |
| 1939 | 156,435.37 | 30,512.36 | 62,574.14 | (32,061.78) |
| 1940 | 339,185.49 | 54,517.85 | 135,674.20 | (81,156.35) |
| 1941 | 881,222.92 | 135,572.76 | 352,489.17 | (216,916.41) |
| Total | 1,641,605.24 | 281,038.04 | 656,641.10 | (375,604.06) |

The balance of the indebtedness, namely, 194,394.76 soles, was not collected by petitioner. The claim for this amount, along with 9,981 shares of Sociedad's stock and certain other claims against Sociedad, all with a tax basis to petitioner of $210,274.93, were disposed of by petitioner in 1942 for a total consideration having a fair market value of $255,000.

In its 1940 return petitioner deducted the amount of $81,156.35, representing the difference between $135,674.20, the sum which would have been realized on the soles collected in that year based on the exchange rate of 2.50 soles to the dollar, and $54,517.85, the amount actually realized at the rates of exchange prevailing in 1940.

In its 1941 return petitioner similarly deducted the amount of $216,916.41, which constituted the difference between $352,489.17, the value of soles collected in 1941 based on the exchange rate prevailing when the indebtedness originally accrued to petitioner, and $135,-572.76, the amount actually realized at the 1941 rate of exchange.

Petitioner did not deduct the differences arising by reason of the collection and conversion of soles in the years 1937 through 1939. Petitioner's deductions exceeded its gross income in each of those years, and no tax was reported. The amount of $53,725.07 was reported by petitioner in 1942 as a long term capital gain realized on its disposal in that year of the balance of the Sociedad indebtedness, the Sociedad stock, and the other claims against Sociedad.

Respondent determined that the amounts of $81,156.35 and $216,-916.41 did not constitute deductible losses in 1940 and 1941, respectively, and further held "that said amounts are not allowable as net operating loss carry-overs within the purview of section 122 of the Internal Revenue Code."

OPINION.

This issue involves the deductibility of amounts representing the decline in the value of Peruvian soles, as measured in United States currency, between the time the soles accrued to petitioner prior to 1928 and the time payments thereof were actually received from Sociedad and converted by petitioner into United States money in 1940 and 1941. Petitioner asserts that this decrease in value resulted in losses deductible in 1940 and 1941 under section 23 (f) [1] and that such losses are includible in the net operating loss carry-overs for 1942. Petitioner also advances, but does not press, the applicability of section 23 (k).

The contentions of respondent will be considered in the order presented upon brief.

Respondent contends initially that no deductible loss was sustained by petitioner at any time by reason of the exchange rate fluctuation, inasmuch as the indebtedness owed by Sociedad was payable in soles and petitioner received the full amount of soles to which it was entitled. In support of this contention, respondent relies principally upon *B. F. Goodrich Co.*, 1 T. C. 1098, 1102.

In the *Goodrich* case the taxpayer, on the accrual basis, borrowed 11,000,000 francs from a French bank in 1933 and repaid the loan in 1936, when the exchange rate was more favorable than that prevailing

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

   *         *         *         *         *         *         *

   (f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

at the time of the borrowing. We held that no taxable income was realized by the taxpayer in this transaction, pointing out, at page 1103, that: "A mere borrowing and returning of property does not result in taxable gain."

The situation in the *Goodrich* case is clearly distinguishable from that presented by the facts here before us. The inception of the debt of 1,836,000 soles owed to petitioner by Sociedad, and the subsequent payment thereof, resulted from construction work performed by petitioner in the ordinary course of its business. This transaction, unlike a mere borrowing and returning of property, obviously gave rise to tax consequences. Petitioner, on the accrual basis, accrued the aggregate amount of 1,836,000 soles, which became due under the construction agreement prior to 1928, as gross receipts and properly reported these soles, translated into dollars at the rates of exchange then prevailing. Cf. *Frank W. Ross*, 44 B. T. A. 1, 18. This inclusion of the soles in its gross receipts afforded petitioner a basis for any subsequent gain or loss. *Maurice P. O'Meara*, 8 T. C. 622. When the payments of soles were actually received from Sociedad and immediately converted into United States currency, petitioner realized less dollars than the amounts previously accrued and reported. Petitioner thereupon suffered losses and, to such extent, it is entitled to the opportunity to recover the basis established. See *Maurice P. O'Meara, supra.*

However, respondent argues that, even assuming that such losses have tax significance, a deduction should be allowed only in 1942, when the entire original indebtedness was "finally closed out," and not in the years 1940 and 1941, when partial payments were received and converted. We can not agree with this contention.

It must be emphasized that we are not confronted with a failure of Sociedad to pay its *debt*. As far as petitioner is concerned, Sociedad complied with its obligation to pay the soles due under the construction agreement. Instead, the losses here in question resulted from the receipt and immediate conversion by petitioner of the soles duly accepted in payment.

The situation presented is not unlike that arising where property is acquired (here accrued) as a whole and thereafter sold in small parcels. The courts, in such cases, have uniformly refused to defer recognition of gains or losses until disposition has been made of the entire property. As we stated in *Nathan Blum*, 5 T. C. 702, 709:

\* \* \* Such contentions are inconsistent with the theory of the tax laws, which are designed to levy taxes upon gains and profits of business for annual periods. *Heiner* v. *Mellon*, 304 U. S. 271. It is now well settled that where property is acquired as a whole, for a lump sum, and subsequently disposed of a portion at a time, there must be an allocation of the cost or other basis over the

several units (except where apportionment would be wholly impracticable) and gain or loss computed and reported upon the disposition of each part. * * * [Citing numerous cases.]

No apportionment problem is raised with respect to the soles in the instant proceeding, inasmuch as they were all accrued and reported at approximately the same rate of exchange.

Upon the receipt and conversion of each payment of soles, petitioner's loss thereon became fixed and certain. The exchange of each group of soles for United States dollars marked a clearly identifiable event and constituted a closed transaction with respect to those soles. It follows that the losses suffered by petitioner on the soles received and converted in 1940 and 1941 were recognizable in those respective years.

Respondent urges, nevertheless, that, if petitioner is entitled to losses from the receipt and disposition of soles in 1940 and 1941, these losses arose from "sales or exchanges of capital assets," within the contemplation of section 122 (d) (4),[2] and, as such, are includible in the net operating loss carry-overs for 1942 only to the extent of capital gains.

The term "capital assets" is defined in section 117 (a) (1) of the code as "property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The question as to whether property is held primarily for sale to customers in the ordinary course of business must be determined on the facts of each case. *Hercules Motors Corporation*, 40 B. T. A. 999, 1000.

It is apparent that petitioner customarily engaged in the performance of its engineering work for countries or concerns outside the United States, receiving payments therefor in foreign currencies. The construction work undertaken for Sociedad was one of petitioner's usual projects, and the receipt and disposition of the soles constituted a normal incident to the conduct of petitioner's business. Petitioner made no attempt to hold the soles as an investment, but immediately converted them into United States dollars at the rate of exchange prevailing at the time of payment. Respondent does not assert, and there

---

[2] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). * * *

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows: * * *

(4) Gains and losses from sales or exchanges of capital assets shall be taken into account without regard to the provisions of section 117 (b). As so computed the amount deductible on account of such losses shall not exceed the amount includible on account of such gains.

is no evidence, that petitioner intended, at any time, to utilize the soles for investment purposes. Under these circumstances, we are of the opinion that the soles were held by petitioner for sale to its customers in the ordinary course of business, and we have so found as a fact. Cf. *Joe B. Fortson*, 47 B. T. A. 158, 162, and *Hercules Motors Corporation, supra.* See also *Gilbert* v. *Commissioner*, 56 Fed. (2d) 361, 362.

Accordingly, we hold that the losses sustained in 1940 and 1941 are ordinary losses and are includible, without limitation, in the net operating loss carry-overs for 1942.

## *Issue 3.*

### FINDINGS OF FACT.

The facts which have been stipulated are found as facts, and the stipulation is incorporated herein by this reference.

Petitioner and the Government of Chile entered into an agreement on December 20, 1928, for construction of school projects, under which Chile agreed that all payments would be made at a fixed exchange value of the peso of 6 pence per peso—a little better than 12 cents per peso. After defaults of Chile, in 1930 and before, in paying for work as it progressed, the parties agreed on February 28, 1931, that the contract should be terminated as of that date, and that Chile would make payment for the work which had been completed up to that time. In October, 1930, Chile owed petitioner over 8,000,000 pesos. Under this liquidation agreement, it was agreed on May 15, 1931, that the amount due petitioner was to be paid in pesos having an exchange value of 6 pence per peso, as in the original contract, and that at this rate of exchange Chile owed petitioner 5,851,076.87 pesos, or $711,362.96.

Petitioner keeps its books and reports its income on an accrual method of accounting. With respect to the construction contract with Chile, petitioner had accrued the dollar amount of income which had accrued under the contract as work progressed and before any payments were made by Chile, and for which petitioner had a claim of right. These accruals amounted to the total sum of $711,362.96, in American money, and that total amount was included in gross income for Federal income tax in either an income tax return or in returns of petitioner for a year or for years prior to 1932. The accruals and the reporting of accrued income in tax returns did not involve inclusion in income of payments received from Chile after May 15, 1931.

Chile did not make any payment under its agreement to pay petitioner 5,851,076.87 pesos prior to July 30, 1931. On July 30, 1931, Chile enacted exchange control legislation which placed control over transactions of purchase of foreign exchange with pesos. Currency

exchange controls were in effect during 1931, 1932, and 1933, and thereafter. An official agency was established to administer the controls and fix the rate of exchange for the peso which was known as the "official" rate, which was called the Exchange Control Commission. Under currency exchange control, the exchange value of the peso declined and the number of pesos required to purchase American dollars increased.

From October 30, 1931, to September 14, 1933, Chile made eight installment payments in pesos to petitioner, and then stopped making payments, taking the position that it had made payments in full under its agreements. Chile paid petitioner the total amount of 5,841,188.87 pesos. It erroneously withheld payment of the balance of 9,888 pesos to pay some claims of exemployees, and petitioner has never received payment of that amount of pesos. The payments in pesos were made as follows:

| Oct. 30, 1931 | ₱200,000.00 | Sept. 2, 1933 | ₱2,903,298.65 |
|---|---|---|---|
| Dec. 10, 1931 | 50,000.00 | Sept. 10, 1933 | 350,717.47 |
| Jan. 21, 1932 | 1,812,172.75 | Sept. 14, 1933 | 400,000.00 |
| Mar. 3, 1932 | 55,000.00 | | |
| Apr. 21, 1932 | 70,000.00 | Total | 5,841,188.87 |

It is stipulated that the agreement of Chile was to make payment in pesos having an exchange value of 12.15 cents, American money.

According to the monetary statistics of the Board of Governors of the Federal Reserve System of the United States, monthly foreign exchange rates (official rates) for the Chilean peso, cents per peso, the peso had the following value in cents in the months and years of the payments which petitioner received from Chile:

| Month and year | Official rate, cents per peso | Month and year | Official rate, cents per peso |
|---|---|---|---|
| Oct. 1931 | 12.0690¢ | Mar. 1932 | 12.0606¢ |
| Dec. 1931 | 12.0669¢ | Apr. 1932 | 10.6538¢ |
| Jan. 1932 | 12.0500¢ | Sept. 1933 | 8.6743¢ |

According to the above, the peso had a value above the exchange value, at the official rate, which the parties agreed upon as the value of the peso to be given by Chile in payment of its obligation to petitioner in October and December of 1931, and in January and March of 1932; and in April, 1932, and September, 1933, the peso had a value lower than the exchange value, at the official rate, agreed upon. The total quantity of pesos received by petitioner in April, 1932, and September, 1933, was 3,724,016.12 pesos. That is to say: The pesos paid by Chile on April 21, 1932, and on September 2, 10, and 14, 1933, had depreciated in their exchange value, at the official rate, below the agreed value for contract payments of 12.0171 cents, and petitioner was paid in depreciated pesos. However, the exchange value of the

pesos received under all of the eight payments in 1931, 1932, and 1933, had an exchange value at the "free" rate of exchange of less than the fixed value of the peso, in which payments were to be made under the contract.

The exchange value of the peso at the official rate and at the free rate of exchange on the dates on which Chile made payments, and on February 28 and May 15, 1931, were as follows:

| Date | Pesos to the dollar | | Date | Pesos to the dollar | |
|---|---|---|---|---|---|
| | Official rate | Free rate | | Official rate | Free rate |
| Feb. 28, 1931 | 8.269 | | Mar. 3, 1932 | 8.367 | 19.50 |
| May 15, 1931 | 8.278 | | Apr. 21, 1932 | 11.292 | 24.25 |
| Oct. 30, 1931 | 8.229 | 10.52 | Sept. 2, 1933 | 10.97 | 26.52 |
| Dec. 10, 1931 | 8.334 | 14.30 | Sept. 10, 1933 | 11.46 | 28.73 |
| Jan. 21, 1932 | 8.268 | 15.10 | Sept. 14, 1933 | 11.46 | 28.73 |

Under the construction contract with Chile, petitioner agreed to advance the capital for taking care of the costs of the work, and Chile agreed to reimburse petitioner for such costs and to pay petitioner a fee for its services, above costs. Petitioner incurred and paid costs for which the payments agreed to on May 15, 1931, were to be reimbursement thereof, plus fees owing to petitioner.

It was understood by the parties that the reimbursements and fees were to be paid in Chilean legal currency at a fixed exchange rate of 6 pence per peso, "so that if the Chilean currency did not represent in the peso that exchange value, it should be compensated with whatever was lacking, and if it should have another higher exchange rate it should be decreased in the payment by the excess of value."

Petitioner did not accept the payments of pesos by Chile as full satisfaction of the contract obligation, and made demands, or "presentation" upon the Ministry of the Treasury and the Ministry of Development of Chile to recalculate the amounts of the payments in pesos so that the payments would be at the rate of 6 pence per peso; and additional payments of pesos were demanded to compensate for the depreciation in the value of the peso. These demands were rejected by the Chilean officials. Further efforts were made by petitioner for an amicable solution of the difficulties, but without success, and, finally, on December 5, 1935, petitioner instituted a suit under which it filed a claim against Chile under article 1999 of the Civil Code. Petitioner alleged breach of the original contract, since Chile had failed to make entire payments under the liquidation agreement, the payments being a condition precedent to the liquidation agreement. Petitioner contended that, since Chile had defaulted in fulfilling the terms of the agreements of February 28 and May 15, 1931,

the construction contract had not been terminated. Petitioner claimed that it had the right to be indemnified, that is, to be reimbursed, with the agreed currency as per the contract for the difference between the value of the peso at 6 pence, and the value of the depreciated pesos given in payment after July 30, 1931. Petitioner alleged that it had not been paid in currency of 6 pence, "but in depreciated currency which the Company has [had] been unable to take out of the country." In the petition filed in the trial court, the petitioner alleged, further, that the values of the peso which had been fixed, after July 30, 1931, from time to time, as the "official" exchange rate did not correspond "to the actual value [of the peso] in the market" on the dates of the payments in 1931, 1932, and 1933. Petitioner made claim for the difference between the actual market value of the peso and the value of 6 pence per peso. In the alternative, petitioner claimed reimbursement for the difference between the "official" rate and 6 pence, or whatever was just. Other claims were made which it is unnecessary to set forth.

The trial court held that petitioner was not entitled to receive additional pesos over and above that which it had received. Appeal was taken to the Chilean Court of Appeals, which rendered its decision on October 13, 1943. The Court of Appeals reversed certain conclusions of fact of the trial court, and held that petitioner had not waived its right to collect a surcharge for the depreciated value of the peso by accepting the payments made by Chile, and that payments should have been made at the rate of 6 pence per peso, which agreement was made in order to protect petitioner from possible fluctuations of international exchange. However, the appellate court affirmed other holdings of the trial court. The Court of Appeals held that the liquidated balance due on the contract for work done up to termination was 2,072,172.75 pesos, which Chile had paid on October 30, 1931, December 10, 1931, and January 21, 1932, and that with respect to these payments, only, Chile should pay a surcharge for the difference between 6 pence and the official rate of exchange existing on the above dates. With respect to the remaining payments, collection of a surcharge was denied for reasons which are not in the record before us in this proceeding. Under the decisions of both courts, petitioner was not entitled to recover 9,888 pesos.

Under the decree of the Court of Appeals, petitioner actually did not recover any further payments from Chile by way of a surcharge for exchange, or anything else. The court held that petitioner was entitled to surcharge with respect to the first three payments only, but petitioner admits that at the time these three payments were made the value of the peso at the official rate of exchange was not depre-

ciated and "those three payments had resulted in an overpayment." at the official rate but not at the "free" rate.

The petitioner had no further right of appeal on fact questions. Counsel advised petitioner that further appeal on the law questions would be futile, and to abandon further litigation, which petitioner did.

Petitioner was obligated to report in its Federal income tax returns during 1931 and prior, as income under the Chilean contract, $711,-362.96. It had reasonable grounds for believing when the accruals were made that it would receive the full amount in pesos equivalent to the above sum.

In 1933, when Chile ceased making payments, petitioner had a claim of right for further payments according to its understanding of the contract with Chile, and its understanding was reasonable. Petitioner did not waive the rights which it believed it had for surcharge payments to compensate for depreciation in the value of the peso. It diligently made demands for further payments. The contract provided that all disputes as to the terms of the contract should be decided by Chilean courts. Petitioner filed *bona fide* claims in Chilean courts for further payments and for surcharge payments. It was not until 1943 that petitioner could and did ascertain that no further payments could be collected. Petitioner sustained a loss in 1943 under the contract. The loss resulted from the failure of Chile to pay petitioner 9,888 pesos, and from the depreciation in the exchange value of the peso below 6 pence, which depreciation in value existed on the dates on which petitioner received payments measured by the "free" rate of exchange.

The Exchange Control Commission established an "official" rate for the purchase of foreign exchange with pesos, but no foreign exchange could be purchased at the official rate without a permit, or license. After July 31, 1931, and during 1932 and 1933, and thereafter for several years, there was a great shortage of foreign exchange, and the Exchange Control Commission restricted the issuance of licenses for the purchase of foreign exchange to transactions in the purchase of food and materials which were essential to the economy of Chile. In fact, no foreign exchange could be purchased by a commercial concern such as petitioner. Petitioner could not obtain a license to exchange pesos during 1931, 1932, or 1933, or thereafter. During the aforesaid period, after July 30, 1931, no permits to exchange pesos at the "official" rate were granted to commercial concerns such as petitioner. The official rates of exchange were used chiefly in certain governmental transactions, and in highly restricted private transactions of types which petitioner did not carry on. For petitioner's purposes, the "official" rate was not a reality.

The Control Commission developed other rates of exchange for certain transactions, and for imports and exports, such as the export draft rate, but petitioner could not qualify under the restrictions and regulations established for issuing permits for exchange at such rates.

There existed, however, other sources of foreign exchange than commodity exports, which were not controlled by the Exchange Control Commission, after July 30, 1931, and during 1932 and 1933. That exchange became known as the "free" exchange, and the rates of exchange were known as "free" rates. The "free" rate was an uncontrolled rate and did not require a permit from the control authorities. The "free" rate was more "expensive" than the "official" rate, requiring more pesos in exchange for a dollar than the "official" rate. The "free" rate of exchange could be availed of by petitioner during 1931, 1932, and 1933, and during that period petitioner could not get a more favorable rate for the exchange of the pesos it received from Chile than the "free" rate.

Petitioner did not take any deduction in any income tax return prior to 1943 on account of receipt of pesos having a value of less than 6 pence, or 12.15 cents.

Petitioner sustained a loss in 1943 because of the decline in the value of the peso below 12.15 cents, at which rate petitioner reported accrued income in the tax returns totaling $711,362.96. Its loss is properly computed on the basis of the "free" rate of exchange and by computing the difference between 6 pence, or 12.15 cents per peso, and the value of the peso at the "free" rate which existed on the dates on which the respective payments were received in 1931, 1932, and 1933.

Petitioner paid the tax shown on its completed return on May 14, 1943. Its tentative return was filed on March 2, 1943, and its completed return on May 14, 1943. The deficiency notice was mailed on January 5, 1946.

### OPINION.

The petitioner accrued $711,362.96 as income under the construction contract with Chile dated December 20, 1928. There is no dispute about the propriety of the accrual. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. Petitioner, keeping its books on an accrual basis, properly accrued such income. The dollar amount was governed by the provision in the 1928 agreement that Chile would make all payments due in pesos of a value of 6 pence per peso. At the time of the accruals, no situation existed to cause petitioner to believe that Chile would fail to comply with its agreement to make payments in pesos at the rate agreed upon in the contract, and petitioner's right to accrue the income was a clear contract right. Cf. mimeograph 6475 (Mar. 1, 1950), I. R. B. 3/20/50, p. 8. [1950–1 C. B. 50.]

In its income tax returns petitioner was required to report income under the contract in dollars. See *International Mortgage & Investment Corporation*, 36 B. T. A. 187, 190, and cases cited.

Chile actually paid fewer pesos than the agreed amount of $711,-362.96, in terms of dollars, so that the earlier accrual of income, and the reporting of income in the above amount in income tax returns exceeded what was received in payment of sums due under the contract. Having reported $711,362.96 for income tax purposes, petitioner now seeks deduction in 1943 for the difference between what was reported as accrued income and what was actually received in subsequent years. There is no doubt that petitioner's contention is correct on this point. See *Ruth B. Rains*, 38 B. T. A. 1189, 1196, 1197; and *Maurice P. O'Meara*, *supra*, pp. 632, 633, and 634, and cases cited. Petitioner's inclusion of $711,362.96 in gross income previously, gives it "a basis for gain or loss."

There are two questions presented. First, whether the claimed deduction is allowable in 1943. If that question is affirmatively decided, we must then determine the amount of the deduction.

The taxable year in this proceeding is 1942. The petitioner seeks to carry back to 1942, an alleged net operating loss of 1943 under sections 122 (a) and 122 (b) (1) of the Internal Revenue Code. Respondent disallowed part of the net operating loss deduction which petitioner took in its 1942 return as a carry-back from 1943. The amount which was disallowed was $628,957.64. Petitioner concedes that respondent has properly disallowed part of the foregoing amount, having abandoned certain issues raised by the pleadings and admitted some errors in the computation made in the 1943 return.

The respondent has advanced a contention that the provisions of section 122 (d) (5) preclude petitioner from including the alleged loss in question in its net operating loss. The provisions of subsection (5) of section 122 (d) do not apply to petitioner, which is a corporation. Clearly, the loss in question was sustained in the conduct of petitioner's business. Obviously, respondent is in error in making this contention.

(a) Under the first question, consideration has been given to the facts relating to the years prior to 1943 to ascertain whether the deduction claimed should have been taken in some earlier year. It is unnecessary to restate the facts, which are set forth fully in the findings of fact. Petitioner's counsel has argued the question fully and ably in his brief. In 1933 Chile ceased making payments, but there remained, according to its obligation under contracts, an unpaid balance of the obligation. Petitioner did not waive its right to receive payment in pesos worth 12.15 cents. And it could not have taken a deduction for the unpaid balance in 1933, prior to attempting to enforce its

claim based upon breach of contract. See *Lee Mercantile Co.* v. *Commissioner*, 79 Fed. (2d) 391, 393, where the Circuit Court of Appeals said:

It is a startling proposition that a taxpayer may, for reasons of his own, decline to enforce a valid claim against a responsible concern and then assert he has sustained a business loss which the Government should share. "Obviously, the mere refusal to perform a contract does not justify the deduction, as a loss, of the anticipated damages. For, even an unquestionable breach does not result in a loss, if the injured party forgives or refrains from prosecuting his claim." *Lucas* v. *American Code Co.*, 280 U. S. 445, 450, 50 S. Ct. 202, 203.

In 1933 the Government of Chile could not have been regarded as unable to discharge the obligation to the extent of its default under the liquidating agreement, and it was a reasonable view of petitioner to believe that it could recover what was due but unpaid. Its claim for further payments was founded upon the terms of a valid contract which were reasonably clear, and petitioner's interpretation was reasonable. The contract itself provided that any dispute over the terms, rights, or obligations should be determined by courts of Chile under the law of Chile. Petitioner made demands upon officials for further payments, and when they failed, it filed a *bona fide* suit against Chile. Clearly, 1933 and 1934 were not the years in which deduction could be allowed. Respondent's argument that 1933 is the proper year for taking the claimed deduction finds no support whatsoever in the evidence, and there is no merit in his contention that the possibility of recovery through litigation was "too speculative." This proceeding is distinguishable upon the facts from *Boehm* v. *Commissioner*, 146 Fed. (2d) 553.

It is equally clear from the evidence, as well as established rules of law, that the year in which the litigation terminated was the correct year to take the claimed deductions. See *Lewellyn* v. *Electric Reduction Co.*, 275 U. S. 243; *Morton* v. *Commissioner*, 104 Fed. (2d) 534; *Edward & John Burke, Ltd.*, 3 T. C. 1031, 1038.

The evidence shows that the maintenance of any further expectation of recoupment, after the decision of the Court of Appeals was illusory.

It is held, therefore, that 1943 is the correct year for the allowance of a deduction under petitioner's claim against Chile. See *Weil, Inc.* v. *Commissioner*, 150 Fed. (2d) 950, 952.

(b) The second question is whether the loss shall be measured by using the "official" or the "free" rate of exchange. This is primarily a fact question. Petitioner contends that the "free" rate must be used, and has introduced substantial evidence in support of its contention. Respondent contends that the "official" rate should be used. He has not introduced evidence which overcomes or weakens petitioner's evidence under this question.

We have come to the conclusion that the loss is properly computed, in this proceeding and under its particular facts, by using the "free" rate of exchange, and the·"free" rates on the dates petitioner received the respective payments in 1931, 1932, and 1933. Respondent advances no argument of any substance on the point of taking the rate of exchange on the dates of the respective payments. In his Mimeograph 5297 (Dec. 16, 1941), 1942–1 C. B. 84, 86, the Commissioner stated his approval of taking the date payments were made when reporting income received in currency of a foreign country. · Petitioner received the eight payments without any conditions attached, and had complete dominion and control over the pesos received, as and when they were received. Respondent apparently agrees on this point, because his own computation of the loss which he has submitted is computed at the "official" rates which existed on each date of the respective payments.

Petitioner has introduced evidence, both documentary and through the testimony of an expert witness, which proves that the currency control authorities granted no licenses to commercial concerns such as petitioner in 1931, 1932, and 1933 to purchase foreign exchange for such purposes as petitioner had; that foreign exchange was so scarce during those years that it could not be obtained under the official controls; and that petitioner could not obtain permission to exchange pesos for foreign exchange from the Exchange Control Commission. That situation existed through 1931, 1932, and 1933. The situation which the evidence describes resembles that which is set forth in *International Mortgage & Investment Corporation, supra.* Since the dollar equivalent of the pesos could not be obtained at the "official" rate, we conclude that it should not be used in valuing the pesos received on various dates of the payments.

The evidence shows, also, that during this period there was an uncontrolled, or free, market in foreign exchange in .which, in effect, a premium had to be paid. The "free" rates of exchange were quoted by banks, and transactions in foreign exchange were carried on under the "free" rates, in the "free" market. It appears from the evidence in this proceeding that the "free" market transactions at the "free" rates of exchange were tolerated by the Exchange Control Commission. It appears to be proper, therefore, to value the pesos on each date of payment in 1931, 1932, and 1933 by use of the "free" rates of exchange on the respective dates, and it is so held. Under this question petitioner is sustained.

Since each case must stand on its own facts where the question which is presented here must be considered, and since the problem of valuing foreign exchange for the purpose of determining income, or gain, or loss under the various provisions of the Internal Revenue

Code involves consideration of the interplay of different principles of Federal tax law, it is difficult to find, as yet, crystallized rules to follow. However, it may be noted that a like solution of a similar problem under similar facts received approval in *Weil, Inc.* v. *Commissioner, supra,* where the issue involved the determination of gain for inclusion in income (rather than a deduction for a loss) from a transaction in Brazil during a period of control of the currency of that country. See also *Morris Marks Landau,* 7 T. C. 12, where the result reached was similar to the result we have reached here.

Under all of the holdings which are made in this proceeding, there must be recomputation of the deficiency under Rule 50. We have not computed the amount of the loss to be deducted in 1943 under the third issue, but that computation can be made readily by the parties upon the basis of the facts found and from various schedules which are in evidence.

Reviewed by the Court.

*Decision will be entered under Rule 50.*