**SEABOARD FINANCE COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 14095.**

United States Court of Appeals Ninth Circuit.

Sept. 6, 1955.

Dana Latham, Austin H. Peck, Jr., Henry C. Diehl, Los Angeles, Cal., for petitioner.

H. Brian Holland, Asst. Atty. Gen., C. Moxley Featherstone, Ellis N. Slack, George F. Lynch, Sp. Assts. to Atty. Gen., Kenneth W. Gemmill, Acting Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.

Before FEE and CHAMBERS, Circuit Judges, and LING, District Judge.

CHAMBERS, Circuit Judge.

Here for review we have an income tax question of Seaboard Finance Company involving the appreciation in value of $2,200,000 Canadian dollars in terms of United States dollars in about a seven month period in 1946. The dollars had no physical existence in this case, but were represented by a credit obligation running from Industrial Acceptance Corporation, Limited, a Canadian corporation, to Seaboard. At the same time a somewhat similar, but still varying, dollar obligation, not due, ran from Seaboard to Industrial in about an equal amount.

The customary positions of the Commissioner of Internal Revenue and of a taxpayer on domestic transactions are transposed. Seaboard claims the appreciation in value of Canadian dollars during the time the credit existed resulted in a capital gain in Canada and the Commissioner says there was no gain at all. We are told by the parties that the gain, if there is one, is the kind of capital gain which is not taxable in Canada. However, if it be a capital gain in Canada on foreign exchange, it will produce tax credits for Seaboard on its United States income tax return for the fiscal year ending September 30, 1947, worth $70,590.-74 (United States) to Seaboard. The Tax Court held that the appreciation of the value of Canadian dollars during the time in question, under all of the circumstances, resulted in no independently realized gain to Seaboard.

The record before the Tax Court consisted of a long stipulation of facts plus

the oral testimony of W. A. Thompson, president of Seaboard during 1946, the year the transaction at issue began, and chairman of the board in 1952, at the time of the trial in the Tax Court. Thompson's testimony on direct may be summarized as an outline of the stipulation and an argument that the transaction had to be made the way it was made. On cross-examination there is some suggestion in questions by government counsel that there were elements of sham in the rather involved dealings which took place. However, no issue of lack of good faith on Seaboard's part is presented by the pleadings or the stipulation of facts. Good faith is not questioned in the Tax Court's decision and the subject is not urged here. We therefore take it that the transaction was entirely bona fide.

The Tax Court has reached its decision and made its findings on the stipulation of facts. Seaboard Finance Company v. Commissioner of Internal Revenue, 20 Tax Court 405. In the posture of the case here, we are in the same position as the Tax Court in evaluating the issues. Our decision must depend on whether or not we agree with its reasoning.

We must now at some length state the facts.

Seaboard is a Delaware corporation. For many years it has had offices in many cities of the United States. It engages in the small loan business, making loans usually to individuals. In 1946, Campbell Finance Corporation, organized under the laws of the Province of Ontario, Canada, was conducting a small loan business in Canada with fifty offices, the business being not unlike Seaboard's in the United States. At all times in 1946 there were 50,000 shares of common stock issued and outstanding. Immediately prior to the transactions herein involved, all of Campbell's stock was owned by Industrial Acceptance Corporation, Ltd., another Canadian corporation.

Before World War II, Industrial's principal business was that of discounting commercial installment paper for re-

tail dealers who had obtained the installment contracts from their customers as incident to sales made to them. Naturally, the war had an adverse effect upon such a business, and Industrial's answer to the problem thus created was to purchase all outstanding Campbell stock and through Campbell engage in the small loan business with individuals. With cessation of hostilities, Industrial was ready to dispose of Campbell.

Early in 1946, negotiations were entered into between Industrial and Seaboard for the sale by Industrial to Seaboard of all of the Campbell stock. A written agreement between Industrial and Seaboard for the sale of the Campbell stock was executed on March 27, 1946, which provided that it was to be formally backdated to January 2, 1946. Industrial's selling price was $2,214,-969.94 (Canadian). However, a complicated formula for the purchase was set up which incorporated Seaboard's objective of paying for the Campbell stock with 100,000 shares of new stock of Seaboard, if it could be marketed for enough to yield $2,214,969.94 (Canadian). Apparently, Industrial did not want the new Seaboard stock on any permanent basis, and we think it is implicit in the arrangements that were made that Seaboard wanted the new stock held by the general public rather than by Industrial. The agreement provided that Industrial would promptly transfer and send to Seaboard the 50,000 shares of Campbell and that Seaboard would send to a Montreal bank 100,000 new shares of Seaboard issued in the name of Industrial to be held in escrow for the account of Industrial. However, the agreement further provided that Seaboard would immediately place in the hands of Industrial in Canada $2,200,000 (Canadian) as a guaranty of Seaboard's undertakings. The reason for placing the 100,000 shares of Seaboard in escrow was explained as being required as a safety measure against possible violation of Securities Exchange laws and regulations in the United States. When registration was accomplished, the stock could then

come out of escrow. With reference to the stock, the contract further provided that Seaboard, for the account of Industrial, would arrange in the United States for underwriters to sell the 100,000 shares of Seaboard in the general market. The proceeds of the sale of Seaboard were to be used to apply on the $2,214,969.94 (Canadian) obligation due Industrial for the purchase price of the Campbell stock. If the Seaboard stock produced more than the obligation of Seaboard to Industrial, Seaboard was to receive the overplus. If the proceeds fell short of the obligation, as eventually happened, then Seaboard was obligated not only to turn over the proceeds of the sale of the Seaboard stock but also to pay the difference required to make the total price of $2,214,969.94 in Canadian dollars. We are told that the reason for handling the transaction in this particular way lay in Seaboard's banker's rule about credit being limited to a certain ratio of credit to existing equity capital in Seaboard. In other words, it is explained that Seaboard didn't have the cash with which to buy the Canadian dollars to meet Industrial's price and couldn't get it from the bankers even on a short time basis unless it issued more stock. It couldn't float an issue for the public without federal registration in the United States, which would take time, whereas action to meet Industrial's price and other terms was required immediately.

It should be related further that there was an escape clause in the contract whereby Seaboard could back out of the transaction by paying a penalty of $100,-000 (Canadian) to Industrial plus any actual damages to Industrial as a consequence of Seaboard's having had technical control of Campbell for a then undetermined time. However, the agreement also provided that until the transaction was fully completed the officers and directors theretofore placed in Campbell by Industrial should remain in office. This would seem to eliminate possible damage to Campbell by Seaboard management.

Then, in detail, the agreement provided that Seaboard would pay 4½% per annum on the purchase price of $2,214,-969.94 (Canadian) from January 2, 1946, until the transaction was fully consummated. From this charge for interest, however, Industrial was to deduct all dividends received by Industrial on the 100,000 shares of Seaboard stock while the Seaboard stock was in escrow. Then it was meticulously provided that inasmuch as Industrial would be holding as cash collateral $2,200,000 to be delivered to it by Seaboard, Industrial would pay Seaboard 4½% interest from the time of deposit to the time of closing the transaction. Effective on the transfer of the Campbell stock by Industrial to Seaboard, Seaboard was to be entitled to such dividends as Campbell might declare.

Promptly after March 27, Seaboard obtained a loan at the Bank of the Manhattan Company of New York for the cash immediately required to be deposited with Industrial. With $2,000,000 (United States), Seaboard purchased $2,200,000 (Canadian) from Canadian Bank of Commerce, Montreal. A United States dollar at that time was worth approximately 10 to 9 more than a Canadian dollar. The Canadian Bank of Commerce in turn paid to Industrial the $2,200,000 (Canadian) for the account of Seaboard. Contemporaneously with this transfer of money by Seaboard a certificate for 100,000 shares of new Seaboard stock, registered in the name of Industrial, was sent to the Canadian bank to hold in escrow. Thereupon, the Canadian bank issued its own receipt for the stock and forwarded it, together with Industrial's receipt for $2,200,000 (Canadian), to Seaboard. At the same time, the Campbell stock came into the United States and into the hands of Seaboard, registered in the latter's name. At this point, the Campbell stock was fully in the hands of Seaboard, subject to its written commitment not to transfer to others the Campbell stock until after the transaction was completed and

**812**

also subject to Seaboard's right to rescind the transaction upon paying a penalty.[1]

It seems not unfair to say that the officers of Seaboard thought the purchase price of the Campbell stock was too high. But this they thought they could offset by an increase in the market value of Seaboard stock (then about $12.50 per share) which would surely occur when the news reached the American public that Seaboard had purchased Campbell. The investing public could be depended upon to run the market price of Seaboard up higher, maybe to $22.

There was delay in getting the new issue of Seaboard registered. Seaboard stock, along with other stocks, went up in market price in the summer of 1946 to a point where 100,000 shares of new Seaboard stock would have paid the purchase price in full for the Campbell stock. But registration lagged and by the time the new Seaboard stock was ready for the public market it had sagged in price, but not quite down to the level of March, 1946, when the transaction was made.

The American underwriters for the sale of the stock operating under an agreement signed by both Industrial and Seaboard finally took the Seaboard stock out of its lodgement in escrow in the Canadian bank, bringing the stock back to the United States, in the latter days of November, 1946, and the net proceeds of the underwriting operation were $1,440,000 (United States). Under the agreement these proceeds should have been sent over to Industrial after being converted to Canadian dollars, and, further, Seaboard was obligated to pay the difference between the proceeds of this new Seaboard stock and the amount of the purchase price in Canadian dollars.

Had the agreed plan been consummated, approximately $2,200,000 (Canadian)[2] would have gone up to Canada and would have been paid to Industrial. Whereupon, Industrial then would have sent $2,200,000 (Canadian) back to Seaboard, this being the amount of the cash bond originally placed in the hands of Industrial by Seaboard.

It should now be reported that by the time the transaction was closed, December 12, 1946, the Canadian dollar had gained in exchange ratio to the United States dollar and the two currencies were on an even basis, dollar for dollar, in exchange. However, there was the customary fee for conversion which applied for converting a United States dollar to a Canadian dollar, and we assume that the same was true vice versa. Desiring, we are told, to avoid the conversion charges, the parties then, by correspondence, agreed that the $2,200,000 (Canadian) originally sent by Seaboard through the Canadian bank to Industrial should be kept by Industrial and that the underwriters in the United States should pay over to Seaboard in the United States the proceeds, $1,440,000, of the sale of the Seaboard stock which had been owned by Industrial and marketed by the underwriters. Accordingly, these major payments were so handled. Also, it may be stated that an adjustment of the accounts arising out of the dividends from Seaboard stock paid to Industrial while the Seaboard stock was in escrow and the $4\frac{1}{2}\%$ interest which was owed by Seaboard and Industrial each to the other on their reciprocal obligations (bearing different dates for commencement) was made between the parties in accordance with the original agreement.

It seems to have been a fact that during the summer or fall of 1946 Seaboard

1. The escape clause in the contract actually was not in the terms of rescission but in the terms of mutual repurchase.

2. The agreed purchase price of Campbell was $2,214,969.94 (Canadian). The deposit with Industrial was $2,200,000 (Canadian). For convenience, in the balance of the opinion, because the deposit and the purchase price were substantially the same, we discuss the case as if the purchase price were $2,200,000 (Canadian); any necessary adjustment hereafter required because of this variance of $14,969.94 may be made by simple arithmetic.

seriously considered taking advantage of the escape clause in its basic contract. However, it did not do so, and in the end closed the transaction as originally agreed upon except as modified at the end by the exchange of credits.

Eventually, it turned out that Seaboard did not want the Campbell company after all. On December 31, 1946, it resold Campbell for a modest profit to Household Finance, a competitor of Seaboard in the United States. That transaction is not here for review.

When the transaction between Industrial and Seaboard was completed and the accounts settled, the $2,200,000 (Canadian) costing $2,000,000 (United States) was worth $2,200,000 (United States). In terms of United States dollars, the Canadian credit of Seaboard with Industrial held by Industrial as a bond for Seaboard's performance had appreciated in the amount of $200,000.

There is no doubt that if Seaboard (without more) had purchased $2,200,000 (Canadian) in March, 1946, for $2,000,000 (United States) and made a deposit of the Canadian sum in a Canadian bank and then in November, 1946, withdrawn the Canadian dollars from the Canadian bank and converted it into United States dollars, resulting in Seaboard's having $2,200,000 (United States) because of the change in the rate of exchange, there would have been a Canadian gain. That, the parties agree, would have resulted in a foreign tax credit, even though the profit was not actually taxable in Canada due to differences in the income tax laws of this country and of Canada. Seaboard tells us that just about the same thing happened here, and it was entitled to the credit.

On the other hand, the Commissioner convinced the Tax Court that nothing ever happened to the taxpayer's dollars while they were "on loan" to Industrial. They just stood still.

The Commissioner's position upon the trial primarily was that the transaction was nothing more nor less than a purchase of 50,000 shares of Campbell for $2,200,000 (Canadian) which was deposited in advance and which actually eventually was used to pay for the Campbell stock. The Tax Court agreed but alternatively suggested if Seaboard made a gain on Canadian exchange in Canada this was exactly offset by a loss in exchange in that Seaboard, from March 27, 1946, had a future obligation to pay for the Campbell stock; that the depreciation of American or appreciation in Canadian currency resulted in a loss on the side of the contract of Seaboard's obligation to pay.

The trouble with following the Commissioner's argument (obviously approved by the Tax Court), that we should telescope the transaction down to a mere sale of Campbell stock for $2,200,000 (Canadian) paid almost simultaneously with the execution of the contract is that if we do so we would have to ignore certain tax consequences involved in the cost basis of the new Seaboard stock in Industrial's hands and the possibilities inherent at the outset in the cost basis of the Campbell stock. We think inasmuch as under the original contract of March 27, 1946, and under the stipulation of facts we must take it that the new Seaboard stock of 100,000 shares for awhile was owned by Industrial, we are prevented from collapsing the transaction to the bare and simple elements the Commissioner contends existed. (To these side factors of cost basis we shall again return.) We are not unmindful of the body of decisions that holds that transactions should be simplified to what they are in substance, rather than accepted in fancy forms in which their scriveners have cast them.

As before alluded to, the Commissioner made no serious contention in the Tax Court that the transaction was a sham. Indeed, he could not. As we read the stipulation of facts signed by both parties, the Commissioner concedes that Seaboard to acquire the Campbell stock had to take every step that was spelled out in the basic agreement of March 27, 1946.

We think it best to begin on the fringes of the problem and work towards the center.

■ First, we can say that if Seaboard had just bought 50,000 shares of Campbell for $2,200,000 (Canadian) to be paid for at a future date, Seaboard would have obtained a gain[3] if Canadian currency had depreciated between the contract date and the payment date. Likewise, if Canadian currency appreciated by the time of payment, then Seaboard would have a loss. Bernuth Lembecke Company, Inc., 1 B.T.A. 1051; Joyce Koebel Co., 6 B.T.A. 403.[4]

Also, we think it clear that if Seaboard had used a hedging transaction for the purchase of the Campbell stock wholly for cash at a future date, there would be no net gain or loss. That is to suggest if Seaboard, agreeing to buy the Campbell stock with payment at a future date and fearing fluctuations in currency, upon the execution of the contract had bought 2,200,000 Canadian dollars and put them in a Canadian bank to await the payment date, then when payment came after an interventing fluctuation in currency any loss or gain from currency speculation would have been offset by an opposite and equal gain or loss on the original undertaking to pay in the future. Bernuth Lembecke and Joyce Koebel, supra.

Further, while in closing the transaction there was not the exchange of checks or drafts originally contemplated (the parties just swapped credits except for the payment of $1,440,000 by the underwriters to Seaboard), we think that we ought to treat the case just as if the checks had been exchanged. If parties could get one result by swapping checks and get another result by swapping credits, our law would have achieved sorry ridiculousness. We shall consider the case as if closed by trading checks.

Some contention is made by appellant that the Tax Court found that the Seaboard stock was held by the Canadian bank for Industrial as "security" for Seaboard's future obligation to see that Industrial received $2,200,000 (Canadian) for the Campbell stock; that such a finding is clearly erroneous. While the Tax Court's language with reference to the Seaboard stock being in escrow is quite awkward, we do not think the Tax Court intended to find the Seaboard stock after issue was at any time held as "security." The Commissioner does not think so either.

In our judgment, the Seaboard stock, registered in the name of Industrial when first issued and placed in escrow in Canada, must be taken fully and completely to have passed titlewise to Industrial. The stipulation of the parties does not admit of any finding that the Seaboard stock, after issue, was held as security for Industrial or that Seaboard had any legal or equitable ownership in the Seaboard stock. Its interest therein was a fervent hope that it would appreciate in price from $12.50 per share to $22 per share and thus produce about $2,200,000 (Canadian) for Industrial, freeing Seaboard of its contingent liability. Instead, it sold for about $14.50 per share, producing $1,440,000 (United States) at a time when the two currencies had achieved par.

---

3. Section 22 of the applicable Internal Revenue Code, 26 U.S.C.A. § 22, still in effect, provides as follows:
   "Gross income
   "(a) General definition. 'Gross income' includes gains, profits, and income derived from * * * interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * · * *" 26 U.S.C. 1946 ed., Sec. 22.

4. Another principle on gains or losses in foreign exchange is that the gain or loss is not recognized until the foreign exchange is disposed of either by reconversion to domestic money or by parting with title to the exchange, a typical example of the latter being when the foreign exchange is transferred for the payment of the price of a current purchase. In Seaboard's case we find that when the legal rights shifted with the ultimate closing, there was the requisite element of "transfer of the exchange."

Because of the government's contention that the cost of the Campbell stock was always $2,200,000 (Canadian) and that it was so fixed on March 27, 1946, we must explore a little this cost factor, for whatever it is worth here. Surely if the Seaboard stock had sold through the underwriters for enough to produce $2,200,000 Canadian, the government would have contended (and rightly so) that Seaboard's cost of the Campbell stock was only $1,250,000 (United States), the market value of 100,000 shares of Seaboard the day it was delivered in escrow registered in Industrial's name. If the Seaboard stock at the time when the two currencies were at a par had sold for $3,250,000, resulting in $2,200,000 going to Industrial and $1,050,000 back to Seaboard, then the corollary would be that the cost of the Campbell stock was $1,250,000 (United States), less $1,050,000, or a net cost for the Campbell stock of $200,000. Thus, we think that Seaboard's contention is valid when it says it could not know its cost of Campbell as of March 27, 1946, until full performance was had of the basic contract.

Obviously, Industrial cannot be bound by stipulation herein made by the Commissioner and Seaboard, but under the standards of our federal tax laws, inasmuch as the whole transaction must in our judgment be broken into segments, we think it is apparent that Industrial acquired the stock at $12.50 per share (United States) and sold it for $14.40 per share net. It had a gain of $1.90 per share, or $190,000 (United States).

■ Let us now return to the closing of the transaction at a time when the exchange was dollar for dollar even. The legal obligations just before the swapping of credits were these:

1. The underwriters for the sale of the Seaboard stock were obligated to send $1,440,000 (United States) to Industrial in Canada.

2. Seaboard was bound to send $760,000 to Industrial (because the sale price of the Seaboard stock was that much short of $2,200,000).

3. Industrial, upon receipt of (1) and (2), would be bound to return to Seaboard $2,200,000, the amount of Seaboard's guaranty deposit, because Industrial would have received $1,440,000 from the underwriters and also $760,000 from Seaboard because Seaboard kept its promise to pay the difference between $2,200,000 and $1,440,000, the sale proceeds of the Seaboard stock.

As already stated, we think the transaction should be treated as if the agreed exchanges were made, instead of the bookkeeping entries and the payment of $1,440,000 made by the underwriters to Seaboard. Applying what we have said, we are of the opinion that the cross-credits on the sum of $760,000 (the amount at which the contingent guaranty became fixed) which could have been closed out between Seaboard and Industrial with a mutual exchange of checks in like amounts, representing on one side the sum paid on the guaranty by Seaboard because the sale price of the Seaboard stock fell short of the hoped-for $2,200,000 and on the other side a return of a portion of the guaranty money, should be treated as including a hedging transaction. That is to say, at closing time, on the $760,000 Canadian (within Seaboard's deposit with Industrial of $2,200,000 owed by Industrial to Seaboard), there was a Canadian gain in that with the intervening depreciation of American currency the $760,000 (Canadian) would buy more dollars (United States) than the $760,000 (Canadian) cost originally. On the other side of the "hedge," on March 27, 1946, $760,000 (Canadian), the eventual amount of Seaboard's cash obligation on its contingent liability to Industrial which had been fixed in November, 1946, could have been purchased for less, something like $690,000 (United States). It would have required $760,000 (United States) to purchase $760,000 (Canadian) at closing. This is recognized as a loss. But the loss is offset by the gain.

While perhaps it can be argued that the same "hedging" is inherent in the sum of $1,440,000 in the deposit with In-

dustrial which turned out to be an equivalent of the proceeds of the sale of Campbell stock, we are unable to isolate this factor of hedging in this $1,440,000, which we do find in the $760,000. Therefore, we hold that there was, in effect, a Canadian gain to be computed in terms of American dollars on the sum of $1,440,000 (Canadian) represented by the difference between the lower figure of the cost in American dollars of that sum on March 27, 1946, and the higher figure of the par exchange on December 12, 1946, when the transaction was closed. In other words, we treat the $1,440,000 (Canadian) as if it had come home to the United States from Industrial.

One of the leading recent cases on foreign exchange gains or losses is Willard Helburn, Inc., v. Commissioner, 1 Cir., 214 F.2d 815. Our conclusion herein to a great extent is based upon what we consider the rationale of that case to be.

The decision of the Tax Court is reversed for proceedings consistent with this opinion.