NATIONAL-STANDARD COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8574–80.     Filed March 21, 1983.

*Warren C. Seieroe*, for the petitioner.
*Thomas E. Ritter*, for the respondent.

OPINION

DRENNEN, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax for its taxable years ending September 30, 1974, and September 30, 1975, in the amounts of $179,971 and $149,350, respectively. Due to concessions by respondent, the only issue for decision is whether foreign currency exchange losses incurred by petitioner in each of the years in issue are deductible as ordinary losses, or instead, as capital losses.

The facts of this case were fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulated facts and exhibits attached thereto are incorporated herein by this reference.

National-Standard Co. (petitioner) is a corporation with its principal office and place of business in Niles, Mich. For its fiscal years ending September 30, 1974 and 1975, petitioner filed its consolidated Federal corporate income tax return with

the Internal Revenue Service, Cincinnati, Ohio. Petitioner kept its books and reported its income on the accrual method of accounting.

Petitioner is a publicly held corporation whose shares are traded on the New York Stock Exchange and the Midwest Stock Exchange. Petitioner is a diversified manufacturer of wire and other metal products, and of machinery. Most of petitioner's products are raw materials used for fabrication or incorporation into another product, or are components to be used in a larger product. During the taxable years in question, petitioner operated 23 facilities in the United States, 4 facilities in the United Kingdom, and 1 facility each in Canada, France, and South Africa. In addition, petitioner had 4 controlled foreign corporations.

Prior to 1970, petitioner owned a 40-percent interest in a German and a Luxembourg corporation which operated manufacturing facilities in Germany, Luxembourg, and Belgium; the remaining 60 percent was owned by Accerces Ruenies de Burback-Eich-Dudelange S.A. (hereinafter ARBED) or its subsidiary (hereinafter sometimes collectively referred to as the ARBED group). As a result of a series of negotiations which commenced in 1970, petitioner and the ARBED group agreed to establish a new corporation known as FAN International, a Luxembourg corporation, to be owned 50 percent by petitioner and 50 percent by the ARBED group. This corporation was to construct a new manufacturing facility in Luxembourg. Each owner agreed to contribute $5 million to the equity of FAN International.

Due to restrictions imposed by the U.S. Government as to the amount which a domestic corporation could invest abroad, petitioner had to borrow from a foreign source to meet its equity contribution requirements for FAN International. In addition, petitioner had to give assurances to the U.S. Government that no part of these funds would be repaid from domestic sources for a minimum of 7 years.

On September 17, 1970, petitioner entered into an agreement with Caisse D'Espargne De L'Etat (hereinafter Caisse), a Luxembourg bank, to borrow 250 million Luxembourg francs (hereinafter LF), then having an equivalent U.S. dollar value of $5 million. The interest rate charged on the loan was 8 percent. The agreement expressly provided that the proceeds

of the loan were to be used solely for satisfying petitioner's equity contribution obligation in FAN International.

Thereafter, petitioner drew down on the Caisse loan commitment as follows:

| Date | Amount |
|---|---|
| Dec. 31, 1970 ................... | LF50 million |
| June 1, 1971 ................... | LF50 million |
| Oct. 19, 1971 ................... | LF50 million |
| Dec. 20, 1971 ................... | LF100 million |
| Total ........................ | LF250 million |

These funds were immediately invested in the stock of FAN International.

In the fall of 1973, petitioner considered either delaying repayment of or refinancing the Caisse loan because, as the time for the first payment thereon approached, petitioner was experiencing certain cash flow difficulties due to expansion. Because of favorable European interest rates and in anticipation of a rise in the dollar's market exchange rate with European currency, petitioner concluded that it would refinance the Caisse loan through Caisse or some other foreign source.

Also during the fall of 1973, petitioner began to reassess its investment in the three FAN entities and began negotiations with ARBED to sell its interests therein. On January 2, 1974, petitioner sold its interest in FAN International and certain other foreign corporations in which ARBED also had an interest, to ARBED for $8,684,875. Petitioner reported a gain on the sale of its FAN International stock on its fiscal 1974 income tax return as long-term capital gain.

Since petitioner was liquidating its Luxembourg investment, Caisse could not, pursuant to its bylaws, refinance its loan to petitioner. Subsequently, petitioner entered into an agreement with Societe Generale Alsacienne De Banque (hereinafter Societe Generale), a Belgian bank, to borrow 250 million Belgian francs (hereinafter BF), the proceeds of which were to be used to pay off its Caisse loan.[1] On February 28, 1974,

---

[1] At all times relevant herein, the Luxembourg franc and the Belgian franc had an equal dollar value.

pursuant to petitioner's instructions, Societe Generale paid BF250 million to Caisse in repayment of the Caisse loan.

On December 26, 1974, petitioner purchased BF266,944,444 from the First National Bank of Chicago. On the same date, these funds were used to pay off the Societe Generale loan of BF250 million plus accrued interest of BF16,944,444. These francs cost petitioner $7,207,499.99.

The exchange rates existing between either the Luxembourg franc or the Belgian franc, on one hand, and the dollar, on the other hand, at the respective relevant dates were as follows:

| Date | U.S. dollar equivalent of 1 Luxembourg or Belgian franc |
|------|------|
| Sept. 17, 1970 | $0.02 |
| Dec. 31, 1970 | 0.0201 |
| June 1, 1971 | 0.0201 |
| Oct. 19, 1971 | 0.0214 |
| Dec. 20, 1971 | 0.0220 |
| Feb. 28, 1974 | 0.02461 |
| Dec. 26, 1974 | 0.0270 |

For its fiscal year ending September 30, 1974, petitioner claimed an ordinary loss of $1,162,500 as a result of the fluctuation in the exchange rates between the time it agreed to borrow LF250 million from Caisse, and the time it borrowed BF250 million from Societe Generale to repay the Caisse loan.[2] For the fiscal year ending September 30, 1975, petitioner claimed an ordinary loss of $587,500 as a result of the fluctuation in the exchange rate between the time it borrowed BF250 million from Societe Generale and the time it purchased Belgian francs to pay off that loan.[3]

The transactions here involved all resulted from petitioner's decision in 1970 to acquire a 50-percent stock interest in a

---

[2] The loss claimed on the Caisse loan was calculated by multiplying the exchange rate of Sept. 17, 1970, .02, by LF250 million, and subtracting the product thereof from an amount equal to the exchange rate on Feb. 28, 1974, .02461, multiplied by BF250 million. This yields a loss of $1,152,500 rather than $1,162,500. Petitioner conceded on brief that the correct calculation was $1,152,500.

[3] The loss claimed on the Societe Generale loan was calculated by multiplying the exchange rate on Feb. 28, 1974, .02461, by BF250 million, and subtracting the product thereof from an amount equal to the exchange rate on Dec. 26, 1974, .0270, multiplied by BF250 million. This yields a loss of $597,500, rather than $587,500. Petitioner claimed on brief that the correct calculation was $597,500.

Luxembourg corporation, using Luxembourg francs to pay for the investment. The stock acquired was undoubtedly a capital asset in petitioner's hands. *Hoover Co. v. Commissioner*, 72 T.C. 206, 237 (1979). When petitioner sold the stock in January of 1974, the simplistic approach to the taxability of the transaction would have been to determine how much petitioner had actually invested in the stock and to deduct that investment from the amount, in U.S. dollars, it received from the sale of the stock, and tax the difference as a long-term capital gain or loss. Petitioner's actual investment in the stock would have been computed by determining the cost to petitioner in U.S. dollars, as of the date of liquidation of the investment, of the number of francs put into the investment.

But when foreign currency, which fluctuates in value with the U.S. dollar, is involved in such a transaction, the simplistic, direct approach to the tax results cannot be, or has not been, applied. The law seems to be (see *Helburn, Inc. v. Commissioner*, 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198, 200 (1956)), and the parties herein agree, that the acquisition and disposition of foreign currency used to make an investment is a separate transaction from the underlying transaction and that gain or loss thereon must be accounted for separately. The reason for this is somewhat apparent from the facts in this case where petitioner had to borrow the francs to pay the purchase price and then sold the stock prior to repayment of the loan; the repayment costing petitioner more in U.S. dollars than it would have cost it at the time the stock was purchased and the original loan was entered into. Because of the required annual accounting for tax purposes, if for no other reason, this requires that we consider the transactions separately for tax purposes.

The parties are in agreement as to the amounts of the losses sustained by petitioner on the foreign currency transactions, which are computed without reference to any gain or loss petitioner may have realized on the sale of the FAN International stock. But we must determine the character of the losses realized by petitioner from having to pay more in U.S. dollars to buy the francs necessary to repay the Caisse loan than the francs were worth in U.S. dollars when the Caisse loan was made, and from having to pay more in U.S. dollars to buy the

francs necessary to repay the Societe Generale loan than the francs were worth when that loan was made.

The introduction of foreign currency into business transactions such as this has given rise to a rather limited, but sometimes inconsistent and indecisive, number of court opinions on how to characterize such transactions for tax purposes. Slight differences in circumstances seem to have been relied on by the courts to reach different conclusions with respect to somewhat similar transactions. This opinion will attempt to explain why we arrive at our conclusion in this particular case without discussion of many of the nuances that come to mind when considering foreign currency transactions.

Petitioner has the burden of proving that its losses were not capital losses. Petitioner's basic argument appears to be that gain or loss arising from the retirement of a liability, as in the instant case, can only give rise to an ordinary gain or loss. This is based, in part, on a statement made by the Court of Claims in its opinion in *Gillin v. United States*, 423 F.2d 309, 313 (1970): "But retiring one's own debt does not result in a sale or exchange or in capital gain (except where Congress so provides specifically)." Petitioner argues that neither the Luxembourg francs nor the Belgian francs were held by it as assets which could give rise to their own gain or loss, that, even if they were assets, they were not capital assets as defined in section 1221, I.R.C. 1954,[4] and even if they were capital assets, there was no sale or exchange of capital assets as required by sections 165(f) and 1211(a).

Respondent maintains that the losses in controversy must be treated as capital losses because the foreign currencies constituted capital assets in petitioner's hands, and the use of those currencies to repay the loans to Caisse and Societe Generale constituted sales or exchanges of capital assets. This is based primarily on the theory that the foreign currencies were properties, hence assets, and that since they were acquired and used directly in connection with the acquisition by petitioner of capital assets (the FAN International stock), the acquisition and disposition of the francs should be accorded

---

[4] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

the same character as the underlying transaction, i.e., a capital transaction.

Section 165(a)[5] allows a "deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(f) provides that losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. Section 1211(a), in the case of corporations, limits the losses allowable from sales or exchanges of capital assets to the extent of gains from such sales or exchanges.

Section 1221 defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," but not including (1) stock in trade or inventory, or property held by the taxpayer for sale to customers in the ordinary course of his business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation, or real property used in his trade or business; and several other exceptions not relevant here.

From the above can be distilled the proposition that for the deduction for the losses here involved to be limited to capital loss treatment they must have arisen from (1) a sale or exchange of (2) property (3) that qualified as a capital asset.

Where the U.S. dollar value of foreign currency borrowed by a taxpayer fluctuates between the time of borrowing and the time of repayment, a profit or loss may be realized by the taxpayer for Federal income tax purposes. *Helburn, Inc. v. Commissioner, supra; America-Southeast Asia Co. v. Commissioner, supra; Gillin v. United States, supra;* cf. *B. F. Goodrich v. Commissioner,* 1 T.C. 1098 (1943). In this case, petitioner incurred losses in each of the years in issue due to the fact that the equivalent dollar value of the francs[6] borrowed increased between the time the respective loans were made and the time the loans were repaid.[7] The only issue before us is the character of those losses.

---

[5]Petitioner hints that these losses may be deductible as ordinary business expenses under sec. 162, but, it does not argue the point and we will not address it.

[6]Because the Luxembourg and Belgian francs were, at all times relevant therein, of equal U.S. dollar value, we shall refer to the foreign currencies borrowed and repaid as "francs."

[7]Since respondent conceded on brief that the repayment of the Caisse loan by borrowing an equivalent amount of francs from Societe Generale resulted in a loss for the fiscal year

All property is considered to be a capital asset unless excluded by one of the enumerated exceptions in section 1221, or by an established judicial exception to the statute. See *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). Foreign currency is generally considered to be "property" for Federal income tax purposes. *Gillin v. United States, supra*; *Helburn, Inc. v. Commissioner, supra*; *Joyce-Koebel Co. v. Commissioner*, 6 B.T.A. 403 (1927). However, if the foreign currency is used by the taxpayer as an "integral part of its ordinary trade or business," it will not be considered a capital asset. *America-Southeast Asia Co. v. Commissioner, supra* at 200; *Church's English Shoes, Ltd. v. Commissioner*, 24 T.C. 56, 59 (1955). See *Corn Products Refining Co. v. Commissioner, supra*.

Initially, we note that neither party has asserted that the foreign currencies fit within any of the defined exclusions of section 1221. Petitioner asserts, however, that the francs it borrowed and purchased were integral parts of its business operations, "i.e., first to invest in the joint venture (FAN International) and later to repay existing liabilities." Thus, petitioner claims that the francs were not capital assets in its hands. We disagree. The facts do not support a finding that petitioner regularly purchased or borrowed foreign currency in the ordinary course of its business; the francs were not used in conducting petitioner's business. Nor were the currencies borrowed or purchased as a "hedge" against fluctuations in foreign exchange rates. The francs were acquired and used solely in connection with petitioner's equity contribution to FAN International, i.e., as an integral part of a capital transaction. See *Hoover v. Commissioner, supra* at 236 et seq. We think the nature of the underlying transaction in this instance, where the purpose for acquiring the francs is so clear, should characterize the nature of the property used to consummate it. Furthermore, petitioner has failed to prove that the francs fall within any of the section 1221 or judicial exceptions to the definition of capital assets. Based on the

1974, and that the repayment of the Societe Generale loan by buying an equivalent amount of francs from First National Bank of Chicago resulted in a loss for the fiscal year 1975, the timing issue is no longer before us.

foregoing, we find that the francs borrowed and purchased by petitioner were capital assets.

Petitioner's argument that it did not acquire or hold the francs as assets in the true sense of the words is inconsistent with its contention that the foreign currency transaction and the underlying transaction must be treated separately. If petitioner did not acquire and theoretically hold the francs, even for a short time, what transaction was there to separate from the underlying transaction, the purchase of the FAN International stock, which we have determined to be a capital transaction? If the francs were simply a medium of exchange, then the only transaction that would have produced a gain or loss would have been the acquisition and sale of the stock. The fact that the francs were transferred directly from the lender to the obligee does not, in the modern day commercial world, mean that petitioner never owned or held the francs it borrowed.

Having found that the francs were capital assets, we must now determine whether there was a sale or exchange of those assets within the meaning of sections 165(f) and 1211(a).[8] Here again the bifurcation of the transaction in which petitioner acquired assets with foreign currency into separate transactions gives rise to questions that are not easily answered.

Petitioner argues that the foreign currency transactions consisted simply of borrowing foreign currency to pay off obligations and that the payment of one's obligation in this manner does not constitute a sale or exchange of an asset. Petitioner's losses were not sustained, so it claims, due to the decline in value of any asset it had acquired but rather because of the increase in the measuring unit of liabilities it had incurred. Petitioner points out that it received value upon the disposition of the francs exactly equal to their cost, the acquisition and disposition thereof having been almost simultaneous.

Respondent's position is that the use of a capital asset by a debtor to satisfy a claim is a sale or exchange of that asset,

[8]Neither party cited *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952), which, at first blush, would appear to be apposite. However, there, the "sale or exchange" requirement of the capital gain or loss statute was provided by sec. 115(c), I.R.C. 1939, which required that liquidating distributions be treated as exchanges. We also think *Arrowsmith* is distinguishable in other respects.

citing *Rogers v. Commissioner,* 103 F.2d 790 (9th Cir. 1939), affg. 37 B.T.A. 897 (1938), cert. denied 308 U.S. 580 (1939); *Kenan v. Commissioner,* 114 F.2d 217 (2d Cir. 1940); and Rev. Rul. 76–111, 1976–1 C.B. 214, and that this principle should be extended to the foreign currency area, despite dicta to the contrary in *Gillin v. United States, supra.* Respondent argues that the disposition of foreign "exchange" by the payoff of the foreign bank loans is the exchange or the equivalent of a sale of an asset for a debt instrument's cancellation. Respondent's theory, as we understand it, is that because the purpose for the acquisition of the francs was to acquire stock in FAN International, a capital transaction, the loss on the foreign currency should be treated as a capital loss.

While respondent's argument that the purpose for which the francs were borrowed, to buy a capital asset, should control the character of the loss on the currency transactions is appealing, a close analysis of what happened does not support the argument, nor does the case law. The loss we are concerned with resulted from the increase in the value of the francs against the U.S. dollar, and whether petitioner realized a gain or loss on the sale of the FAN International stock is in no way involved, unless the basis of the FAN stock was adjusted to reflect the change in the value of the francs used to purchase it. But both parties agree that such an adjustment should not be made and that the transactions should be considered separately, which finds support in the case law. *Helburn, Inc. v. Commissioner, supra; America-Southeast Asia Co. v. Commissioner, supra; Church's English Shoes, Ltd. v. Commissioner, supra.* See also Rev. Rul. 78–281, 1978–2 C.B. 204. This being so, and looking at the transactions separately, while the character of the underlying transaction has frequently been found to influence the character of the foreign currency transaction, i.e., whether it was a capital transaction or one incurred in the ordinary course of the taxpayer's business, it does not necessarily follow that the character of the gain or loss involved in the underlying transaction controls the character of the gain or loss involved in the foreign currency transaction, because the two are theoretically unrelated. The characters of the gains or losses resulting from the two transactions must be determined independently under sections 165(f) and 1211(a) of the Code.

This Court has considered several cases involving gain or loss resulting from changes in foreign exchange rates where the taxpayer had borrowed foreign currency to purchase assets.[9] However, in only two of those cases did we consider whether the gain or loss was ordinary or capital in nature.

In *Church's English Shoes, Ltd. v. Commissioner, supra,* the taxpayer purchased inventory (shoes) from an English company on credit, payable in pounds sterling. When the taxpayer paid its debt 12 years later, the pound had devalued in relation to the U.S. dollar, and consequently the number of pounds needed to pay off the debt cost $2,063 less than the U.S. dollar value of the equivalent number of pounds at the time the credit was extended. In addition to holding that the taxpayer had realized taxable income from the foreign currency transaction separate and apart from gain or loss realized on the purchase and sale of inventory, we found that "the purchase of foreign money was no more than a usual and reoccurring transaction in the ordinary course of its business" and therefore held that such income was not entitled to capital gains treatment since there had been no sale or exchange of a capital asset. 24 T.C. at 59.

In *America-Southeast Asia Co. v. Commissioner, supra,* the taxpayer borrowed pounds sterling to purchase inventory (burlap) in India, the funds being paid directly from the bank to the Indian seller. Later in the same taxable year, the taxpayer purchased enough pounds to pay off its debt. However, because the pound had been devalued in the intervening period, the pounds cost $29,410 less than the U.S. dollar value of the same number of pounds at the time of the loan. We held that the taxpayer realized a gain to the extent of the difference, and that such gain was not entitled to capital gains treatment. In so holding, we stated that "of overriding importance here is that petitioner's transaction in foreign

---

[9]See *Bennett's Travel Bureau, Inc. v. Commissioner,* 29 T.C. 350 (1957); *America-Southeast Asia Co. v. Commissioner,* 26 T.C. 198 (1956); *Church's English Shoes, Ltd. v. Commissioner,* 24 T.C. 56 (1955); *Willard Helburn, Inc. v. Commissioner,* 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); *Foundation Co. v. Commissioner,* 14 T.C. 1333 (1950).

The Court also considered the character of the gain or loss on transactions in foreign currency in *Hoover Co. v. Commissioner,* 72 T.C. 206 (1979); *International Flavors & Fragrances, Inc. v. Commissioner,* 62 T.C. 232 (1974), revd. and remanded 524 F.2d 357 (2d Cir. 1975); *Wool Distributing Corp. v. Commissioner,* 34 T.C. 323 (1960), but those cases involved "hedges" and "short sales" which are not argued in this case.

exchange was an integral part of its ordinary trade or business," citing *Corn Products Refining Co. v. Commissioner, supra.* (26 T.C. at 200.)

These cases are of little help to us herein since, as we have found, the foreign currency transactions were not an integral part of petitioner's ordinary trade or business, and consequently such currencies were capital assets.

More recently, the Court of Claims, in *Gillin v. United States, supra,* held that gain was realized when the taxpayer, an individual, borrowed Canadian dollars, immediately converted them into U.S. dollars for personal use, and then subsequently purchased the same amount of Canadian dollars to pay the loan off, at a cost of $19,000 less than the equivalent U.S. dollar value at the time of the initial borrowing. According to the Court of Claims, the gain was realized at the time the Canadian dollars purchased were paid in satisfaction of the debt. The court concluded "retiring one's own debt does not result in a sale or exchange" (423 F.2d at 313), citing *Fairbanks v. United States,* 306 U.S. 436 (1939),[10] and that, therefore, the gain was not a long-term capital gain.[11] Similarly, in the instant case, we are dealing with foreign currency (capital asset) which was acquired and used to satisfy indebtedness.

Rev. Rul. 78-281, 1978-2 C.B. 204, appears to support petitioner's position. The facts upon which the ruling was based were quite similar to the facts herein. T borrowed foreign currency to pay for a machine used in its equipment rental business in the foreign country. The ruling holds first that the basis for the machine and its ultimate selling price

---

[10]See *KVP Sutherland Paper Co. v. United States,* 170 Ct. Cl. 215, 344 F.2d 377 (1965).

[11]While the Court of Claims held the character of the gain involved to be ordinary income from the discharge of an indebtedness for less than face value, relying on *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931), we find no particular relevance in *Kirby Lumber Co.* as applied to this case for purposes of determining the character of a loss. See concurring opinion of Skelton, J., in *Gillin v. United States,* 191 Ct. Cl. 172, 423 F.2d 309, 314 (1970); see also note 13 *infra.* We do, however, find significance in the court's reliance on *Fairbanks v. United States,* 306 U.S. 436 (1939), in holding that no sale or exchange had occurred. In *Fairbanks,* the Supreme Court held that the redemption of corporate bonds before maturity was neither a sale nor an exchange within the commonly accepted meaning of those words.

We also recognize that the facts in *Gillin v. Commissioner, supra,* were quite different from the facts in this case in that Gillin, an individual, apparently purchased the foreign currency purely for speculation.

are to be determined in U.S. dollars based on the exchange rates prevailing on the date of purchase and the date of sale, respectively, and second, that the taxpayer will realize ordinary gain or loss upon each payment on principal of the foreign currency loan equal to the difference between the dollar value of the principal which is discharged and the dollar value of the foreign currency used to make the repayment on the date such payment is made.

Respondent has relied on *Kenan v. Commissioner, supra,* in support of his position that a sale or exchange occurred upon the repayment of the debts herein. His reliance, however, is misplaced. That case stands for the proposition that a taxpayer realizes a capital gain or loss upon the transfer of appreciated or depreciated property in satisfaction of a debt. When petitioner borrowed francs from Societe Generale to repay the Caisse loan, it was not satisfying its Caisse obligation with depreciated property. Those francs were acquired by petitioner and transferred to Caisse on the same day, and their U.S. dollar value did not change. Likewise, when petitioner purchased francs to repay the Societe Generale loan, the purchased francs were transferred the same day to Societe Generale in satisfaction of the debt. Consequently, under the rationale of *Kenan v. Commissioner, supra,* no loss was realized.[12]

And yet, petitioner certainly realized an economic loss upon the repayment of each of the loans herein as a result of the currency fluctuations, which loss is recognized for tax purposes. This loss did not result from the transfer of depreciated property in satisfaction of a debt, but rather was due to the fact that the amount of the debt itself had increased, in terms of U.S. dollars.

In short, the losses incurred herein were the result of the repayment of an indebtedness with more U.S. dollars than

---

[12]Respondent would find a capital loss by calculating the "amount realized" as the U.S. dollar value of the francs at the time borrowed, less the "adjusted basis" calculated as the U.S. dollar value of the francs at the time the respective debts were repaid. See sec. 1001(a). However, the amount petitioner "realized" was not the U.S. dollar value of francs when borrowed. Rather, it was the extinguishment of a debt at a time that debt had a U.S. dollar value equal to the cost of the francs used to pay off such debt.

were originally borrowed.[13] And, the satisfaction of an indebtedness alone does not constitute a sale or exchange. *Fairbanks v. United States*, 306 U.S. 436 (1939); *Gillin v. United States, supra* at 313. We cannot ignore this gap in reaching our conclusion.

Accordingly, having found that the repayment of the debts herein with francs having a greater U.S. dollar value than at the time francs were borrowed did not constitute a "sale or exchange," we hold for petitioner.[14] Because of concessions by petitioner (see note 2),

*Decision will be entered under Rule 155.*

Reviewed by the Court.

DAWSON, *J.*, concurring: Because the majority opinion has in my view correctly categorized the transactions as the retirement of debt obligations, I concur in the result.

At first blush, the facts of this case have all the markings of a short sale, and hence sale or exchange treatment would be provided under section 1233(a). *Hoover Co. v. Commissioner*, 72 T.C. 206, 243 (1979). However, this case was fully stipulated and carefully framed by the parties, who only advanced certain arguments.[1] As such, insufficient evidence was pre-

---

[13]This is not to say that the amount repaid was in fact more than the face amount of the debt. To the contrary, exactly what was owed, was paid, to wit, BF250 million. Rather the U.S. dollar cost of repaying that loan had increased.

[14]Some of the more recent cases which considered foreign currency transactions cited in note 8, involved short-sale transactions which, if sec. 1233 is applicable, produce capital gains or losses, and/or transactions for hedging purposes, which normally result in ordinary gain or loss. We have not discussed them because we can find no short or forward sales of the foreign currencies in this case, and the evidence does not support a finding that petitioner engaged in the foreign currency transaction for hedging purposes. Petitioner entered into these transactions to acquire an interest in a foreign subsidiary and was required to use foreign currency by the laws of the United States and the bylaws of the Luxembourg bank.

[1]Respondent's hesitancy to argue that this constitutes a short sale might result from the risk, if he were successful, of allowing taxpayers in subsequent cases to be able to choose whether a sale or exchange occurs. If sale or exchange treatment depended solely upon the application of sec. 1233(a) to the closing of a short sale, a taxpayer might avoid that section's provisions merely by retiring a foreign currency loan with cash.

sented to accurately determine if there was in fact a short sale.[2] Therefore, respondent's request that we analogize these transactions to short sales in order to provide support for a *separate theory* on which sale or exchange treatment could be derived was correctly denied.[3] If the proper treatment of these transactions is outside the language of the statutes, that is a situation which Congress should address. Lacking such legislative guidance, I agree with the majority that the principles of *Fairbanks v. United States*, 306 U.S. 436 (1939), govern here.[4]

I disagree with the majority's reliance on Rev. Rul. 78–281, 1978–2 C.B. 204. As to that ruling's applicability, the facts of this case are no different from those in *Hoover Co. v. Commissioner, supra,* where we held that the ruling provided no aid to the taxpayer because "from a tax viewpoint there is generally little similarity between a piece of equipment and a share of stock in a foreign corporation." 72 T.C. at 248.

---

[2] We are informed that the Caisse loan proceeds were "invested" in FAN International stock in what appears to be either a sec. 351 or sec. 118-type transaction. Thus, it is not clear whether petitioner was ever "short," that is, at risk with respect to the LF 25 million. For example, we do not know whether the francs were irrevocably invested in assets by the subsidiary; whether petitioner could compel its subsidiary to repay its capital contribution in the same amount of francs; or whether the *payment* by ARBED of the price of the stock was done in francs. The presence of some or all of these factual situations arguably precludes qualification as a short sale.

[3] "Since section 1233 is a very specific, detailed, and intricately interwoven statute, extending it by analogy is unwarranted." *Carborundum Co. v. Commissioner,* 74 T.C. 730, 738 (1980). See *American Home Products Corp. v. United States,* 220 Ct. Cl. 386, 601 F.2d 540, 550 (1979). I note that under respondent's rationale an analogy to an additional interest payment under sec. 163 might be equally appropriate. See Treasury Department Discussion Draft, 45 Fed. Reg. 81711, 81713, 81717, examples 4 and 5 (Dec. 8, 1980).

[4] See and compare Newman, "Tax Consequences of Foreign Currency Transactions: A look at Current Law and an Analysis of the Treasury Department Discussion Draft," 36 Tax Law. 223, 229–232 (1983). The dissenting opinion would hold that sale or exchange treatment is proper by analogy, not to sec. 1233 (however, see pp. 569–570 of the dissent) but to a short sale itself.

Aside from the tautologous notion that a short sale necessarily involves a sale or exchange, no authority is offered which supports this analogy. On the contrary, the dissent's view would render sec. 1233(a) as mere surplusage. Indeed, the dissent's argument is unavoidably premised on the statement that (p. 567):

"When petitioner originally borrowed the francs, it in effect sold those francs short * * * "

I am at a loss to understand how a taxpayer's *borrowing* and then returning property (whether it be an auto, a bushel of wheat, or Belgian francs) would constitute a *sale,* in law *or* effect. By borrowing and holding, a taxpayer has neither sold nor is he short. Moreover, I see no reason to treat the creation of an obligation by borrowing property as different from its retirement. If such is the case, the dissent's view is totally incompatible with the doctrine of *Fairbanks v. United States,* and is therefore unwarranted.

Accordingly, the ruling provides no support for petitioner's case.

FAY, WILES, and HAMBLEN, *JJ.*, agree with this concurring opinion.

TANNENWALD, *Chief Judge*, dissenting: I disagree with the majority's conclusion that there was no sale or exchange of the francs and that therefore petitioner's losses were ordinary rather than capital losses. Before proceeding to articulate the reasons for my disagreement, I believe it would be useful to outline the parameters within which I make my analysis.

First, the parties agree that the borrowing and repayment of foreign currency, on the one hand, and the investment in and sale of the FAN International stock, on the other, are to be treated as separate transactions in the sense that each transaction produces separate tax consequences. See *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198 (1956); *Church's English Shoes, Ltd. v. Commissioner*, 24 T.C. 56 (1955), affd. per curiam 229 F.2d 957 (2d Cir. 1956); *Willard Helburn, Inc. v. Commissioner*, 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954).

Second, it is also agreed that petitioner suffered losses of $1,152,500 and $597,000 in its taxable years ending September 30, 1974, and September 30, 1975, as a result of the repayment of the loans.

Third, I agree with the majority that the francs[1] constituted capital assets in the hands of petitioner and that such characterization, at least in this case, stems from the nature of the asset acquired by petitioner with the borrowed francs. Francs were property held by petitioner (*Willard Helburn, Inc. v. Commissioner, supra*; *Joyce-Koebel Co. v. Commissioner*, 6 B.T.A. 403 (1927)) and do not fall within the exceptions of section 1221 or the doctrine of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). "The touchstone of the *Corn Products* doctrine is that seemingly capital transactions are

---

[1] No attempt is made in this opinion, and none appears necessary, to distinguish between the Luxembourg franc and the Belgian franc, because at all pertinent times they had an equal dollar value.

entitled to ordinary treatment only when the transactions are an integral part of the taxpayer's day-to-day business operations or are necessary to protect or generate ordinary operating income." *Hoover Co. v. Commissioner*, 72 T.C. 206, 237 (1979). Petitioner's use of the francs to invest in FAN International simply does not fit within the exception carved out by *Corn Products. See Hoover Co. v. Commissioner, supra* at 236 et seq. See also *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed for lack of jurisdiction 550 F.2d 43 (1st Cir. 1977); Rev. Rul. 78–396, 1978–2 C.B. 114.

Fourth, when property is used to satisfy an obligation, the courts have consistently held that such property has been sold or exchanged. See, e.g., *United States v. Davis*, 370 U.S. 65 (1962); *Freeland v. Commissioner*, 74 T.C. 970 (1980); *Danenberg v. Commissioner*, 73 T.C. 370, 380–381 (1979), and cases cited thereat.

Against the foregoing background, I turn to my analysis of why I disagree with the majority's conclusion that petitioner's transfers of francs to Caisse and Societe Generale did not constitute sales or exchanges. In so concluding, the majority, mistakenly, I believe, deals with the issue in the context of the cases involving the discharge of an indebtedness and, so it seems to me, falls into a trap by treating the francs as money akin to dollars despite its recognition that francs are property.

In my opinion, the appropriate way to deal with the issue is by way of analogy to a short sale.[2] When petitioner originally borrowed the francs, it in effect sold those francs short, i.e., it agreed to deliver the amount of francs borrowed at a future date. When it acquired francs and used them to repay the loan, it closed the "short sale." At that time, it realized and was entitled to recognize its losses. The measure of its losses is the difference between the value of those francs at the time of the original borrowing and the value of the francs used for repayment at the time they were acquired, i.e., their cost, and its holding period is determined by the period of time the francs acquired in repayment were held—in this case, less than 1 day. Thus, petitioner in effect bought and sold francs

---

[2] I recognize that the short-sale ground was not argued by the parties. But we are nevertheless entitled to decide a case for respondent on any appropriate legal theory. See *Smith v. Commissioner*, 56 T.C. 263, 291 n. 17 (1971).

and, in this frame of reference, there was clearly a sale or exchange. To be sure, the situation herein is the reverse of the usual situation, where the acquisition of the asset used precedes, rather than follows, the sale or exchange, but that fact does not require a different conclusion. Cf. sec. 1233(a). See *Bingham v. Commissioner*, 27 B.T.A. 186, 189 (1932). See also *Provost v. United States*, 269 U.S. 443 (1926).

At this point, I observe that the value of the franc at the time of repayment of the loan is irrelevant, as is the case with any short sale.[3] Thus, for example, if a taxpayer sells one share of stock short on February 1, when the value of that share is $100, purchases a share of stock on March 1 for $50, and closes the short sale on June 1, when a share of such stock is worth $110, his gain is $50 ($100 – $50), and the $110 value is irrelevant. The taxpayer's holding period for the stock would be from March 2 through June 1, inclusive. I would apply the same analysis to a borrowing and repayment of foreign currency.

In making the foregoing analysis, I am not unaware of the fact that certain cases have held that a borrowing and repayment in the same foreign currency and in the same amount does not give rise to taxable gain or loss. *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 175 (1926); *B. F. Goodrich Co. v. Commissioner*, 1 T.C. 1098, 1102–1103 (1943); *Coverdale v. Commissioner*, a Memorandum Opinion of this Court dated June 28, 1945. But these holdings have been severely criticized and are now considered to have lost their vitality so that there can be no doubt that the majority is correct in concluding that

---

[3]Although the articulation in the decided cases seems to consider the value of the foreign currency at the time of repayment as one of the two prongs of measurement, the issue of the relevancy of that standard of measurement has, as far as I can determine, never been directly considered. See *Gillin v. United States*, 191 Ct. Cl. 172, 423 F.2d 309 (1970); *KVP Sutherland Paper Co. v. United States*, 170 Ct. Cl. 215, 344 F.2d 377 (1965); *Bennett's Travel Bureau, Inc. v. Commissioner*, 29 T.C. 350 (1957); *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198 (1956); *Church's English Shoes Ltd. v. Commissioner*, 24 T.C. 56 (1955); *Willard Helburn, Inc. v. Commissioner*, 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); *Foundation Co. v. Commissioner*, 14 T.C. 1333 (1950). Cf. *Seaboard Finance Co. v. Commissioner*, 20 T.C. 405, 417 (1953), revd. on other grounds 225 F.2d 808 (9th Cir. 1955). But see Samuels, "Federal Income Tax Consequences of Back-to-Back Loans and Currency Exchanges," 33 Tax Law. 847, 864 n. 55 (1980). In his concurring opinion in *Gillin v. United States*, *supra*, Judge Skelton discusses the holding period issue in terms (which I believe to be incorrect) of the period during which the *dollars* used to acquire the foreign currency were held. It appears that Judge Skelton's analysis may have been influenced by the parties' agreement that the payment of the debt did not create the income.

tax consequences attach to such borrowings and repayments. See *Gillin v. United States*, 191 Ct. Cl. 172, 178–179, 423 F.2d 309, 312 (1970); *Willard Helburn, Inc. v. Commissioner*, 214 F.2d 815, 819 (1st Cir. 1954), affg. 20 T.C. 815 (1st Cir. 1954); *Fifth Ave.-Fourteenth St. Corp. v. Commissioner*, 147 F.2d 453, 457 (2d Cir. 1945), revg. 2 T.C. 516 (1943); D. Ravenscroft, Taxation and Foreign Currency 219–221 (1973); Newman, "Tax Consequences of Foreign Currency Transactions: A Look at Current Law and an Analysis of the Treasury Department Discussion Draft," 36 Tax Law. 223, 229 (1983); Miller, "Foreign Currency Transactions: A Review of Some Recent Developments," 33 Tax Law. 825, 828 (1980); Roberts, "Borrowings in Foreign Currencies," 26 Taxes 1033 (1948).[4] See also Committee on Foreign Activities of U.S. Taxpayers, Section of Taxation, American Bar Association; Report on U.S. Treasury Department Discussion Draft on Foreign Exchange Gains and Losses, 36 Tax L. Rev. 425, 427 (1981).

Similarly, I am not unaware of the fact that the short-sale analogy has been advocated and rejected. See *Bowers v. Kerbaugh-Empire Co.*, *supra*. But this rejection has been criticized (see Roberts, *supra*) and, in view of the criticism of the case itself, seems to have been sapped of its vitality. In this connection, I note that in *America-Southeast Asia Co. v. Commissioner*, *supra*, this Court observed that there is a marked similarity between transactions in foreign currencies and short sales (see 26 T.C. at 200) but rested its decision on another basis, and in *Gillin v. United States*, *supra*, the Court of Claims did not reject the short-sale analogy but also rested its decision on another basis. See 423 F.2d at 313 n. 9. Cf. *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979). In short, I think that, given the economic equivalence between a short sale and a borrowing and repayment in foreign currency, the time has come to apply the short-sale analogy in the instant case. Under these circumstances, it can be forcefully argued that this case could be disposed of under the provisions of section 1233(a) (cf. *Hoover Co. v. Commissioner*, *supra*), al-

---

[4]Of course, if a taxpayer borrowed foreign currency, continued to hold it, and used it to make repayment, there would be no gain or loss, because the value at the time of borrowing and the cost of acquisition would be the same. See Roberts, "Borrowings in Foreign Currencies," 26 Taxes 1033, 1034 (1948).

though I recognize that we have articulated a restrictive view with respect to extending section 1233 by analogy. See *Carborundum Co. v. Commissioner*, 74 T.C. 730, 738 (1980). See also *Vickers v. Commissioner*, 80 T.C. 407 n. 14 (1983).

I agree with the majority that respondent's reliance on *Kenan v. Commissioner*, 114 F.2d 217 (2d Cir. 1940), is misplaced, but I disagree that the rationale of that case requires the conclusion that petitioner herein realized no loss. Reasoning from this conclusion, the majority further concludes that, absent an appreciation or depreciation in the value of the property used to repay a debt, there is no sale or exchange. In reaching this further conclusion, the majority fails to recognize that in *Kenan* the obligation was at all times a *dollar* obligation, the value of which remained constant for tax purposes. See *Hellerman v. Commissioner*, 77 T.C. 1361 (1981). In such a situation, the amount of the gain or loss is clearly the difference between the dollar amount of the obligation and the cost of the property used to make payment. Thus, *Kenan* did not deal with the issue involved herein, and the quantum leap which the majority takes in applying its rationale misses the mark. The inescapable element in *Kenan*, namely its holding that there was a sale or exchange, clearly supports my position herein.

Nor does *Kentucky & Indiana Terminal Railroad Co. v. United States*, 330 F.2d 520 (6th Cir. 1964), require a different result. In that case, the Sixth Circuit Court of Appeals merely addressed the question of whether gain from the use of foreign currency could be excluded from income under section 22(b)(9) of the Internal Revenue Code of 1939 (now section 108 of the Code); the Circuit Court had no occasion to consider the character of the gain because of the broad language of the applicable statute, i.e., "the amount of *any income* of the taxpayer *attributable* to the discharge * * * of any indebtedness." (Emphasis added.)

The majority relies on *Fairbanks v. United States*, 306 U.S. 436 (1939), and *Gillin v. United States*, 191 Ct. Cl. 172, 423 F.2d 309 (1970), as authority for its holding that "satisfaction of an indebtedness alone does not constitute a sale or exchange."[5]

---

[5] It is unclear to me the extent to which the majority adopts the reasoning of the Court of Claims. Compare pp. 562, 563, 564 with note 11.

*Fairbanks*, however, involved a taxpayer who received U.S. dollars in retirement of a corporate bond. I know of no cases (other than *Gillin*), nor has my research located any, where *Fairbanks* has been extended to the transfer of *property* rather than *dollars* in satisfaction of a debt. In my opinion, *Gillin* was wrongly decided. I believe that, subject to the qualification noted in note 3 *supra*, Judge Skelton's concurring opinion in *Gillin* is correct in concluding that a sale or exchange occurred and produced a short-term capital gain.

Nor do I believe, as does the majority, that Rev. Rul. 78–281, 1978–2 C.B. 204, supports petitioner's position. In *Hoover Co. v. Commissioner*, 72 T.C. 206, 247 (1979), we noted that the key to that revenue ruling is that "The financing transaction was incident to the taxpayer's *business of leasing equipment* — which generates ordinary income—and therefore the currency fluctuations gave rise to ordinary income or expense." (Emphasis added.) In other words, the foreign currency was not a capital asset under the *Corn Products* doctrine.[6] Thus, Rev. Rul. 78–281 provides no guidance as to whether a sale or exchange took place. In this case, the foreign currency borrowings were not incident to the business of petitioner which produced its ordinary income, i.e., the sale of metal products and machinery, and Rev. Rul. 78–281 is inapposite.

I would hold that petitioner's losses were short-term capital losses and not ordinary losses.

SIMPSON, STERRETT, PARKER, KÖRNER, SHIELDS, and COHEN, *JJ.*, agree with this dissenting opinion.

---

[6]Indeed, we went even further and announced that to the extent that our view in *Hoover* was inconsistent with the rationale we had applied in *International Flavor & Fragrances, Inc. v. Commissioner*, 62 T.C. 232 (1974), revd. on other grounds 524 F.2d 357 (2d Cir. 1975), which involved an investment in a foreign subsidiary, we would no longer adhere to that rationale. See 72 T.C. at 237.